GETTY OIL COMPANY (EASTERN OPERATIONS), INC., Plaintiff,

v.

SS PONCE DE LEON, her engines, tackle, etc., et al., Defendants.

No. 73 Civ. 3480.

United States District Court,
S. D. New York.

March 5, 1976.

As Amended March 28, 1976.

Kirlin, Campbell & Keating, New York City, for plaintiff; Lawrence J. Bowles, New York City, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City, for defendants Sun Leasing Co. and Transamerican Trailer Transport, Inc.; Lawrence J. Mahoney, Vincent J. Barra, New York City, of counsel.

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW.

LEVET, District Judge.

This suit is a claim in admiralty brought by Getty Oil Company (Eastern Operations), Inc. ("Getty") against Transamerican Trailer Transport, Inc. ("Transamerican") which grows out of a collision between a vessel owned by plaintiff, known as "Wilmington Getty," with a vessel owned by defendant Transamerican, known as "Ponce De Leon," on May 10, 1973.

The case was tried to the court without a jury on September 19, 1975.

After hearing the evidence presented by the parties, examining the exhibits, the pleadings, the briefs and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, this court makes the following Findings of Fact and Conclusions of Law:

### FINDINGS OF FACT

1. Getty Oil Company (Eastern Operations), Inc. was and still is a corporation organized and existing under the laws of the State of Delaware and having an office and place of business at 660 Madison Avenue, New York, New York and was and still is the owner and operator of the steam tanker Wilmington Getty. The Wilmington Getty is a steam tanker 13,659 gross tons, 583.5 feet in overall length and 74.2 feet in breadth. On May 10, 1973 she was laden with a cargo of about 20,000 tons of heating oil and gasoline and her drafts were 31 feet 9 inches forward and 31 feet 11 inches aft. She was engaged on a voyage from Delaware City, Delaware, bound for Bayonne, New Jersey. (Stipulation # 2.)

2. Sun Leasing Co. and Transamerican, defendants, were and still are domestic corporations organized and existing under and by virtue of the laws of one of the states of the United States with offices and places of business at 358 St. Marks Place, Staten Island, New York. Sun Leasing Co. is the owner of the Ponce De Leon and Transamerican was the operator of the said vessel.

The Ponce De Leon is a steamship of 15,134 gross tons, 700 feet in overall length, 92.2 feet in breadth. The distance from her bridge to her bow is approximately 350 feet. Her steam turbine engines are of 32,000 horsepower. At the material times she was laden with a cargo of trailers to drafts of 21 feet 8 inches forward and 24 feet 6 inches aft. Her displacement was thus approximately 19,400 tons. She was engaged on a voyage from San Juan, Puerto Rico to the Transamerican Terminal, Staten Island, New York. (Stipulation # 3.)

3. During the morning of May 10, 1973, the Wilmington Getty was proceeding up Ambrose Channel. At 0807 hours the Wilmington Getty passed Buoy R "6" in Ambrose Channel and at 0817 hours the Wilmington Getty passed Buoy R "10" in the aforesaid Ambrose Channel. (Ex. 5, May 10, 1973, Ex. 3.)

4. Dense fog had pervaded Ambrose Channel during the early morning hours of May 10, 1973, resulting in a congestion of vessels seeking ingress to New York Harbor. (See Stipulation # 4.)

5. As a result of the foggy conditions the Master of the Wilmington Getty decided to anchor while awaiting the fog to clear. As the Wilmington Getty proceeded up the channel, her radar indicated that the various anchorage areas were crowded and her master decided to anchor off Norton's Point, Brooklyn; at approximately 0856 the Wilmington Getty anchored off Norton's Point with

three shots (290 feet) of anchor chain in the water. (Ex. 5; Ex. 10, p. 26.)

6. The site where the Wilmington Getty so anchored was outside the normal anchorage area, known as Anchorage 25, and was located at the head of the customary navigable throughway used by vessels approaching the only safe anchorage after exiting Ambrose Channel at Buoy 18. (Ex. 16, pp. 50, 60.) Such a position, therefore, was not a usual nor customary place of anchorage for vessels awaiting assistance from tugs or for awaiting inclement weather conditions to improve. (Ex. 16, pp. 58, 60; Tr. 47, 48.)

7. Upon anchoring the vessel the master of the Wilmington Getty put the vessel's engines on "Finished With Engines" ("F.W.E."). The Wilmington Getty takes approximately three to five minutes to get underway when the engine telegraph is on F.W.E. (Ex. 1, pp. 27, 48; Ex. 10, p. 12.)

8. Had the engines of the Wilmington Getty been placed on "Standby Engines" the vessel would have been capable of immediate movement. (Ex. 1, pp. 27, 48; Ex. 10, p. 12.)

9. The Wilmington Getty's watch officer, Mr. Farago, was not given any instructions regarding the status of the engines on May 10, 1973, when he relieved the watch. (Ex. 1, p. 26; Ex. 10, p. 23.)

10. A security call which advised all vessels in the vicinity that the Wilmington Getty was anchored in a position outside the normal anchorage area was transmitted by the Wilmington Getty immediately upon anchoring. (Ex. 10, pp. 20–22.)

11. However, this security call was never repeated by the Wilmington Getty at any time before the collision. (Ex. 10, pp. 20–22.)

12. At all times after the Wilmington Getty anchored, a seaman was placed on her bow to ring her bell forward for five seconds at intervals not exceeding one minute. This was the proper fog signal for a vessel at anchor under the United States Inland Rules, Article 15(d), 33

U.S.C.A. § 191(d). A licensed mate was stationed on her bridge to monitor her bridge-to-bridge radio telephone which was set on Channel 13. (Farago, Ex. 1, pp. 14, 15; Brixen, Ex. 10, pp. 11, 22–23.)

13. At approximately 1146, on May 10, 1973, the Ponce De Leon arrived at Ambrose Light Tower. (Ex. 16, pp. 17, 54.) At that time the master of the Ponce De Leon decided to follow the SS Sealand Boston up Ambrose Channel and maintained a distance of approximately one mile astern of the Sealand Boston. Three or four other vessels proceeded astern of the Ponce De Leon at the same speed and kept a fixed relative position behind the Ponce De Leon. (Ex. 16, pp. 55–57.)

14. During all material times herein the Ponce De Leon sounded a prolonged blast on her fog horn at intervals of less than one minute, which was the proper fog signal for vessels underway pursuant to the United States Inland Rules, Article 15(a), 33 U.S.C.A. § 191(a). The Ponce De Leon's bridge-to-bridge radio telephone was set on Channel 13 and was being monitored as required by the Bridge to Bridge Telephone Act, 33 U.S. C.A. § 1201 et seq. (Ex. 16, pp. 19, 20, 33, 48, 59; Ex. 26.)

15. The current in Ambrose Channel was flooding with a velocity of approximately .5 knots at material times herein. (Brixon, Ex. 10, pp. 16, 17; Meade, Ex. 16, p. 40.)

16. At approximately 1300 hours on May 10, 1973 the Wilmington Getty completed swinging with the tide and the vessel was then headed approximately 160°–168°, parallel to Ambrose Channel, a different position than the position at which the Wilmington Getty originally anchored at 0856 hours. (Ex. 1, pp. 12–14; Ex. 10, pp. 16, 26, 27.) At such a locale, the Wilmington Getty was in close proximity to the outer perimeter of Ambrose Channel.

17. At approximately 1300 hours on May 10, 1973 the Ponce De Leon was proceeding up Ambrose Channel. She was equipped with two radars, both of

which were functioning at all material times. (Ex. 16, p. 20; Ex. 26.)

18. The master of the Ponce De Leon, Captain Meade, learned by radio that his tugs were then fogbound. Unable to proceed further without the help of tugs, the master of the Ponce De Leon decided to leave the channel and anchor in Anchorage Area 25 while awaiting more favorable weather conditions and the assistance of tugs to continue toward his destination. (Exs. 2, 21.)

19. Just prior to coming abeam of Buoy 18, the master of the Ponce De Leon observed a target at the extreme edge of his radar, which was set at a two mile scale. This target was later identified as the Wilmington Getty. (Meade, Ex. 16, pp. 22–23, 46.)

20. At the time of this first radar sighting, the Sealand Boston was in close proximity to the Wilmington Getty. This was because the stern of the Wilmington Getty had swung with the tide and had relocated near the perimeter of Ambrose Channel. The propinquity of the Wilmington Getty to the Sealand Boston gave the illusion of only one target as observed on the radar of the Ponce De Leon. (Ex. 16, pp. 22, 24.)

21. At the time of this first radar sighting, the Ponce De Leon was traveling at 10.5 to 11 knots. (Ex. 16, pp. 27–29.) This figure is computed by calculating speed based on the Ponce De Leon's arrival time at certain fixed locations. The Ponce De Leon passed Buoy 14 at 1302 hours. (Ex. 16, p. 27; Ex. 18; Ex. 20, pages for May 10, 1973.) Buoy 18 was passed at 1309 hours. The distance between Buoy 14 and Buoy 18 was 1.25 miles on May 10, 1973.

22. Under the weather and traffic conditions in the area of Ambrose Channel on May 10, 1973, the Ponce De Leon was traveling at an excessive rate of speed in traveling the distance between Buoy 14 and Buoy 18.

23. Prior to passing Buoy 18, the master of the Ponce De Leon, Captain Meade, estimated that the target observed on radar, later identified as the Wilmington Getty, was approximately .5–.7 miles off Norton's Point, which was at a point to the east of the buoys which marked Ambrose Channel. Thus, Captain Meade should have known that the Wilmington Getty was located outside the main shipping channel with respect to vessels proceeding through Ambrose Channel and the Narrows. (Ex. 16, pp. 24, 46.)

24. Captain Meade continued to observe the Wilmington Getty on radar but made no manual plot of its relative positions. (Meade, Ex. 16, pp. 25, 26.)

25. At approximately 1308–1309, the Ponce De Leon reached Buoy 18, and her course was changed to the right to permit her to leave Ambrose Channel and proceed to a safe anchorage. (Ex. 20, May 10, 1973.)

26. At the same time (1308–1309 hours), the Ponce De Leon was observed on radar by the watch officer of the Wlimington Getty. (Ex. 1, p. 18.) At that time the watch officer of the Wilmington Getty, Mr. Farago, considered the Ponce De Leon a "threat" to the Wilmington Getty when the Ponce De Leon began to turn right just after passing Buoy 18. (Ex. 1, pp. 41, 55.)

27. The watch officer of the Wilmington Getty continued to observe the Ponce De Leon on radar until the time of the collision. At no time, however, did the watch officer of the Wilmington Getty make a manual plot of the movements of the Ponce De Leon. (Ex. 1, pp. 22, 42, 43.)

28. After the Ponce De Leon turned out of Ambrose Channel and was beyond Buoy 18, there was a radio conversation between the Wilmington Getty and the Ponce De Leon, although it is unclear as to who initiated this communication. This conversation took place at approximately 1311 and at the time the Ponce De Leon was .5–.6 miles away from the Wilmington Getty. (Ex. 16, p. 42; Ex. 1, p. 19.)

29. During this communication between the Wilmington Getty and the

914

Ponce De Leon the Wilmington Getty, through watch officer Farago, informed the Ponce De Leon, through Captain Meade, that the Wilmington Getty was at anchor off Norton Point. The Ponce De Leon, through Captain Meade, replied by stating that the Ponce De Leon would pass between the Wilmington Getty and Norton Point. (Ex. 16, p. 42; Ex. 1, p. 19.)

30. At 1311, the engine speed of the Ponce De Leon was ordered reduced to "Dead Slow Ahead." (Ex. 20.) The Ponce De Leon took five minutes to travel from Buoy 18 to the point of collision, a distance of one mile. Thus, it can be calculated that the Ponce De Leon averaged 12 knots in traveling from Buoy 18 to the point of collision. (Ex. 16, pp. 32, 33.) Captain Meade, Master of the Ponce De Leon, admitted this was not a low speed. (Ex. 16, p. 39.) Considering the weather and traffic conditions then existing, the Ponce De Leon was traveling at an excessive rate of speed in journeying the distance from Buoy 18 to the point of collision.

31. The Wilmington Getty was anchored with her port anchor; two crew members were located on the bow in the vicinity of the anchor. The anchor chain was secured by a pawl and wheel brake. (Ex. 1, pp. 28–30, 52.) I find that the anchor could have been "let go" by lifting the pawl and turning the wheel brake. This procedure would have taken approximately two minutes. (Ex. 1, pp. 52–53; Tr. pp. 69, 70, 117.)

32. Had the brake on the anchor on the Wilmington Getty been released before the collision, the Wilmington Getty would have begun to drift astern with the current and away from the ultimate point of collision. (Ex. 1, p. 56; Tr. pp. 73, 88.)

33. There was no proof adduced at trial to show that the crew of the Wilmington Getty made any attempt to release the anchor brake before the collision.

34. As the Ponce De Leon approached the Wilmington Getty, the officers of the Ponce De Leon, Potocka, Benson and Ahorrito, all testified that they heard fog signals from the Wilmington Getty before visual sight of her and they further testified that Captain Meade was so informed. (Potocka, Ex. 28, p. 5; Benson, Ex. 29, p. 6; Ahorrio, Ex. 30, p. 4.) Captain Meade denied he ever heard the Wilmington Getty's fog signals or that they were ever reported to him. (Meade, Ex. 16, pp. 43–45.)

35. Captain Meade visually sighted the Wilmington Getty "just seconds" before the collision. The officers of the Ponce De Leon estimated that the Wilmington Getty became visible at a distance of 25–100 feet. (Meade, Ex. 16, p. 48; Potocka, Ex. 28, p. 3; Benson, Ex. 29, p. 3; Ahorrio, Ex. 30, p. 3.)

36. Upon visually sighting the Wilmington Getty, Captain Meade ordered a hard left in an effort to swing the stern of the Ponce De Leon away from the Wilmington Getty. (Ex. 16, pp. 91, 92.)

37. At no prior time to the collision did the Ponce De Leon attempt to stop or reverse her engines. (Meade, Ex. 16, p. 45.) Captain Meade admitted that at the time of visually sighting the Wilmington Getty, if he had backed the Ponce De Leon's engines full speed astern he would not have had time to stop the Ponce De Leon before the collision. (Meade, Ex. 16, pp. 48, 49.) I attribute the inability to stop the Ponce De Leon to the excessive speed at which the vessel was then traveling.

38. At approximately 1314 hours the Ponce De Leon collided with the Wilmington Getty, causing damage to the Wilmington Getty's bow and the Ponce De Leon's port side. (See Stipulation # 6.)

39. In the opinion of the court, the Ponce De Leon contributed to the collision by the following acts:

1. The speed of the Ponce De Leon was excessive from Buoy 18 to the point of collision;

2. The Ponce De Leon failed to make a manual plot on its radar upon first sighting the Wilmington Getty;

3. The Ponce De Leon failed to stop her engines upon first hearing the fog signal of the Wilmington Getty or upon first observing the Wilmington Getty.

40. In the opinion of the court, the Wilmington Getty contributed to the collision by the following acts:

1. The failure of the Wilmington Getty to issue additional security calls after anchoring;

2. The failure of the Wilmington Getty to keep her engines on "Standby" while anchored in a hazardous locale;

3. The failure of the Wilmington Getty to make a manual plot after observing the Ponce De Leon on radar;

4. The failure of the Wilmington Getty to "let go the anchor chain" after observing the Ponce De Leon on radar.

## DISCUSSION

On May 9, 1975 the Supreme Court issued an historic decision in the case of *U. S. v. Reliable Transfer Co., Inc.,* 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). *Reliable* overturned the century-old *divided damages rule* in maritime collision cases which was first expressed by the United States Supreme Court in *The Schooner Catharine v. Dickinson,* 58 U.S. (17 How.) 170, 15 L.Ed. 233 (1854).

Under that rule, courts were required to equally divide property damage resulting from a maritime collision or stranding whenever both parties were guilty of contributory fault, whatever the degree of that fault. *Reliable* now directs the trial court to allocate fault proportionately based on the comparative fault of the respective parties. Thus, courts may now apportion fault on a more equitable basis. As was stated by Justice Stewart, writing for the Court in *Reliable,* at page 405, 95 S.Ct. at 1713, 44 L.Ed.2d at 259:

"It is no longer apparent, if it ever was, that this solomonic division of damages serves to achieve even rough justice. An equal division of damages is a reasonably satisfactory result only where each vessel's fault is approximately equal and each vessel thus assumes a share of the collision damages in proportion to its share of the blame, or where proportionate degrees of fault cannot be measured and determined on a rational basis. The rule produces palpably unfair results in every other case. For example, where one ship's fault in causing a collision is relatively slight and her damages small, and where the second ship is grossly negligent and suffers extensive damage, the first ship must still make a substantial payment to the second. 'This result hardly commends itself to the sense of justice any more appealingly than does the common law doctrine of contributory negligence. . . .' G. Gilmore & C. Black, The Law of Admiralty 528 (2d ed. 1975). . . ."

Prior to the decision in *Reliable* the only way a court could avoid dividing damages was by application of the major-minor fault rule. This doctrine was excellently described in footnote 2 of *N. M. Paterson & Sons, Limited v. City of Chicago,* 209 F.Supp. 576 (1962) at page 583. It was stated therein,

"The 'Major-minor fault' rule, usually expressed in terms of an exception to the alleged 'rule' of equal division of damages in cases of mutually-caused collision, allows the court to impose the total amount of damages upon the ship more at fault, either *by excusing a recognized fault* of the minor offender, or by resolving all factual doubts in favor of the minor offender, once the court has determined that it is, in fact, a minor offender. *The Great Republic,* 90 U.S. (23 Wall.) 20, 23 L.Ed. 55 (1874); *The City of New York,* 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84 (1893); *The Victory,* 168 U.S. 410, 18 S.Ct. 149, 42 L.Ed. 519 (1897); Griffin, The American Law of Collision § 245 (1949); Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Cal.L. Rev. 304 (1957). *By this method the*

court could thus excuse completely a fault which it felt to be 'minor' and impose full liability upon an offender who obviously is not fully to blame, a result which certainly poses an alternative with possibilities as harsh as that which divides damages equally where the respective faults are other than equal." (Emphasis added.)

On this same point is an interesting article by A. Chalmers Mole and Lyman P. Wilson entitled, *A Study of Comparative Negligence,* which appeared in 17 Cornell L.Q. 333 (1932):

"The rule of equal division of loss in such case either holds this wrong-doer entirely free from all guilt and liability, thus *condoning slight but nevertheless real contributory negligence,* or it charges her with one-half of the total loss, in effect holding her as guilty as the other party, whose negligence may have been gross and inexcusable. An allocation of the damages in the ratio of, say, one-fifth to four fifths, appeals much more strongly to our sense of justice." 17 Cornell L.Q. 333 at page 352. (Emphasis added.)

In the most recent edition of the Suffolk University Law Review, it was said:

"The 'major-minor fault' rule is sometimes used to mitigate the harshness of the divided damages rule in a situation where one vessel is guilty of merely minor technical blame shown not to have contributed to the cause of the collision. In such cases, the error of the second vessel will be ignored, and the vessel guilty of gross error will bear the entire burden of the loss. Furthermore, where the active fault of one vessel far overshadows only the passive fault of omission of a second vessel, 'the interests of justice are best served by condemning the more culpable vessel completely.' The major criticism of this rule, as with the doctrine of error in extremis, is that it is inexact and nebulous in its definition, and in application it is anything but standardized. *Furthermore, it can hardly be regarded as more just to hold blameless a vessel which was actually at fault,* albeit in a relatively minor degree, *than it is to make a vessel only minimally at fault bear one-half the damages of a collision.*" 10 Suffolk U.L.R. 116, at pages 122, 123 (1975). (Emphasis added.)

It is readily apparent that the *Reliable* case has ramifications beyond the mere apportioning of damages. For example, acts by a vessel which were previously excused under the *major-minor* rule might now subject the same vessel to some degree of liability under *Reliable.* As Judge Murphy stated in *In re Adams' Petition,* 125 F.Supp. 110 (D.C.S.D.N.Y., 1954) at page 114,

"The *patent injustice of equal division has led to judicial straining in some cases to let off entirely the ship only slightly to blame under a major-minor fault doctrine in collisions.* After a half-century of application in nearly all other leading maritime nations, the rule of proportional division has been found workable, not unduly burdensome upon triers of fact and not giving rise to a multiplicity of appeals." (Emphasis added.)

Unquestionably, as Judge Murphy aptly points out in *Adams,* courts in some instances have excused slight fault by a vessel by use of the *major-minor* rule.

Assume, arguendo, a vessel which is involved in a collision is 20% at fault. Prior to *Reliable,* the court would have to either divide damages (see *In re Adams,* supra) or attempt to fit the facts into the *major-minor* rule where minor fault would be excused. See an interesting article on this point in 50 Tulane L.R. 148 at pages 149, 150, wherein it was said:

"The failure of the United States to adopt a rule of proportionate damages has frequently produced unusually harsh results. Consider a collision between two vessels. Assume, for example, that vessel A was 80 per cent at fault and suffered $100,000 in damages, while vessel B was 20 per cent at fault and suffered $10,000 in damages. Under the divided damages rule, the

damages would be totaled, divided by two, and payment would be ordered in such a manner as to make the loss equal on both sides. Since the damage to vessel A exceeded the moiety, she would not be required to compensate the other vessel. But vessel B, even though only 20 percent at fault, would be required to pay $45,000 in addition to making her own repairs. Thus, seeking to avoid the application of the divided damages rule, litigants often engage in what has been referred to as transatlantic forum shopping."

Today, under *Reliable*, such slight fault should not be overlooked. However, if courts use past collision case law where major-minor was applied as *stare decisis* in post-*Reliable* lawsuits, such a result could occur. *A fortiori*, maritime collision case law must be re-evaluated and re-analyzed. If courts follow a policy of *stare decisis et non quieta movere*, the purpose of *Reliable* will never be fulfilled. Courts must be wary not to apply major-minor precedents as a basis for deciding post-*Reliable* cases since such applications will destroy apportionment in maritime collision lawsuits. As was said in 36 Louisiana L.R. 279 at page 295 (1975),

"By recognizing the unfairness of requiring a vessel greatly at fault to pay the entire damages of a mutual fault collision, the *Reliable* opinion strongly implied that the major-minor principle is of no further use."

With this background, I will now discuss the liabilities of the respective parties.

## LIABILITY OF THE PONCE DE LEON

The Ponce De Leon was travelling at an excessive rate of speed from Buoy 18 until the point of collision, see Finding of Fact # 39(1). Dense fog had pervaded Ambrose Channel during the early morning hours of May 10, 1973, see Finding of Fact # 4; visibility could best be described as nil.

Under the circumstances, the Ponce De Leon had to be guided by Article 16 of the Inland Rules, 33 U.S.C. § 192, which states in part:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances."

Courts throughout the country are in accord as to the meaning of moderate speed. This court wrote back in 1960:

"It is well settled that in a fog a vessel must proceed at a moderate rate of speed, and upon hearing the signal of an approaching vessel ahead must stop its engines and navigate with caution. . . ." *Afran Transport Co. v. The Bergechief,* 170 F.Supp. 893 (D.C.N.Y.) at page 898, affd., 274 F.2d 469 (2 Cir.).

Judge Chase succinctly stated the rule in *The Tuxedo*, 77 F.2d 354 (2 Cir.) at page 355:

"What is moderate speed under such circumstances is a rate of speed not in excess of that which will permit a vessel to stop within the distance she can see another vessel with which she may be in danger of collision. *The Colorado v. The H. P. Bridge,* 91 U.S. 692, 23 L.Ed. 379; *The Nacoochee,* 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687; *Appeal of Central R. Co. of New Jersey* (C.C.A.) 22 F.(2d) 275."

This same standard is applicable today. The Master of the Ponce De Leon admitted in his own deposition that he was unable to stop his vessel upon sighting the Wilmington Getty. (See Finding of Fact No. 37.) The fact that the Ponce De Leon was equipped with two radars is inapposite to the issue of speed under inclement weather conditions. The Radio Telephone Regulations (33 CFR § 26.01(b)) do not relieve a vessel from the obligation to proceed with moderate speed during foggy conditions. Thus, the Ponce De Leon was in violation of Article 16 prior to and at the time of collision in that it did not proceed with moderate speed under the foggy conditions apparent on May 10, 1973.

Referring to Finding of Fact # 39(2), no crew member of the Ponce De Leon

manually plotted the location of the Wilmington Getty after its initial sighting. The proof is undisputed as to this point. Such inaction on the part of the Ponce De Leon is violative of Article 29, 33 U.S.C. § 221, which states:

> "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

The Court of Appeals, in affirming this court in *Afran Transport Co. v. Bergechief*, supra at page 475, wrote:

> "It is likely that there was time for plotting, and this would have revealed the exact speed and course of the Burgan. We cannot be sure of this. Although her speed was diminishing, the estimate of five knots could not have been much out of the way; and it would seem to be a good general rule that if a radar pip shows another vessel nearby and forward on your starboard bow, *you should stop and make the time for a plot.*" (Emphasis added.)

Under the circumstances of poor visibility and crowded traffic conditions, it was negligence on the part of the Ponce De Leon to fail to make a manual plot of the location of the Wilmington Getty.

The Ponce De Leon further violated Article 16 by failing to stop her engines or navigate with caution when the fog signals of the Wilmington Getty became audible. The master of the Ponce De Leon denied hearing the fog signals of the Wilmington Getty. However, three officers of the Ponce De Leon (Potocka, Ahorrio and Benson) admit that they heard fog signals just prior to the collision in question. (See Finding of Fact # 34.) The failure of Captain Meade to hear the Wilmington Getty's fog signals did not relieve the aforementioned officers from taking evasive action. Captain Meade testified that none of his officers reported fog signals to him prior to the collision. (See Finding of Fact No. 34.) Consequently, the Ponce De Leon cannot escape responsibility for failure to act. Thus, the action, or more precisely, inaction, taken by the master and officers of the Ponce De Leon upon hearing the Wilmington Getty's fog signals was in violation of Article 16 of the Rules of the Road.

Unquestionably, the statutory violations and negligent navigation of the Ponce De Leon were a proximate cause of the collision which occurred on May 10, 1973 between the Ponce De Leon and the Wilmington Getty.

Accordingly, I find that the Ponce De Leon was guilty of fault which was a proximate cause of the collision which took place on May 10, 1973 at approximately 1314.

## LIABILITY OF THE WILMINGTON GETTY

As was heretofore mentioned, the acts of a vessel must be viewed in a different light as the result of *U. S. A. v. Reliable Transfer*, supra. Courts must take a fresh look as to what constitutes negligence so that the true purpose of *Reliable* may be achieved.

This court cannot say that the Wilmington Getty was negligent in anchoring where she did on the morning of May 10, 1973. It is undisputed that such a locale was not an ordinary nor customary place of anchorage for vessels using Ambrose Channel on the morning of May 10, 1973. However, under the circumstances of inclement weather and crowded traffic conditions, it cannot be said that the Wilmington Getty did not act reasonably under the circumstances in choosing its anchorage site. On the other hand, the Wilmington Getty, realizing her precarious anchorage locale, should have taken steps to advise subsequently arriving vessels of her situation. The General Prudential Rule, 33 U.S. C.A. § 221, states:

> "Nothing in these rules shall exonerate any vessel, or the owner or master or

crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the *special circumstances of the case.*" (Emphasis added.)

In this regard, I find that the Wilmington Getty should have issued periodic security calls after anchoring. The record shows that the Wilmington Getty issued a security call immediately upon anchoring but issued none thereafter, See Findings of Fact # 10, 11. Such additional security calls would have given advance warning of the Wilmington Getty's status to oncoming vessels. Considering the weather and traffic conditions, such additional security calls would not have placed an undue burden on the Wilmington Getty considering its choice of a hazardous place of anchorage.

Secondly, the engines of the Wilmington Getty should have been placed on "Standby" to provide the Wilmington Getty with instantaneous maneuvering power in the event of an emergency. It is undisputed that the Wilmington Getty was "Finished With Engines" at the time of the collision. (See Finding of Fact # 7.) It is clear that the watch officer of the Wilmington Getty, Mr. Farago, considered the Ponce De Leon a threat to the Wilmington Getty when he first sighted the Ponce De Leon on radar after the Ponce De Leon had turned right after passing Buoy 18, see Finding of Fact # 26. Had the engines of the Wilmington Getty been kept on "Standby", effective evasive action could have been taken by the Wilmington Getty.

This court is familiar with *The Charles Hubbard,* 229 F. 352 (6th Cir., 1916), which states on page 356:

"It is argued by counsel that if the Pollack had had her steam up and her engines in condition for immediate moving of the vessel, she could have backed away from the Hubbard when the collision was threatened, and so have avoided the accident. There is

no evidence whatever in the record *that it was customary* for a ship lying at anchor, as the Pollack was, to maintain engines and boilers in condition for such immediate movement, and since no such decided cases have been produced as authority for this claim, it cannot be allowed. For these reasons, this third claimed error must be overruled." (Emphasis added.)

It should be noted that the instant case does not reflect the "customary" situation of a ship at anchor. Although the Wilmington Getty might have been justified because of weather and traffic conditions in anchoring where she did, this does not alter the fact that the Wilmington Getty elected to anchor in a dangerous locale. It was incumbent that the Wilmington Getty take precautions which were suitable to the abnormally hazardous circumstances of her place of anchorage.

Thirdly, the Wilmington Getty should have "let go the anchor chain" after observing the Ponce De Leon on radar. In *Sun Oil Co. v. SS Georgel,* 245 F.Supp. 537 (S.D.N.Y.1965), this court pointed out that a vessel at anchor must take action, if she can, to avoid a collision. It was stated therein:

"A vessel at anchor which can take action to avoid collision must do so. But an anchored vessel is at first entitled to rely on moving vessels to avoid her. *The Lady Franklin* [2 Low. 220], 14 Fed.Cas. p. 934 (No. 7,984) (D.Mass. 1873). Her first duty is to remain at rest. *The Ceylon Maru,* 266 F. 396 (D.Maryland, 1920) reversed on other grounds, 281 F. 538 (4th Cir. 1922). *If she has the power to avoid the accident, she should do so.*" 245 F.Supp. 537 at page 545. (Emphasis added.)

On this same point is *Wells v. Armstrong,* 29 F. 216 (S.D.N.Y.1886):

"Doubtless less vigilance is required of a vessel at anchor. Ordinarily, a vessel anchored in a proper place, in the day-time, and in fair weather, is not expected, or legally required, to be on the watch, and to stand prepared to

take measures to avoid vessels underway, and having control of their motions. *The Lady Franklin*, 2 Low. 220; *The Rockaway* [D.C.], 19 F. 449. *But under exceptional circumstances, where the vessel under way is subject to special difficulties or embarrassments in her navigation, some care and precautions on the part of the vessel at anchor may become obviously prudent and necessary that would not otherwise be obligatory.*" 29 F. 216, at 219. (Emphasis added.)

Unquestionably, watch officer Farago considered the Ponce De Leon to be a threat upon sighting the Ponce De Leon on radar, see Finding of Fact # 26. The Wilmington Getty was aware that the Ponce De Leon intended to pass between the Wilmington Getty and Norton Point, see Finding of Fact # 29. Had the Wilmington Getty "let go the anchor chain," the Ponce De Leon would have been provided with additional latitude in which to effect her passage between the Wilmington Getty and Norton Point. The Wilmington Getty was anchored with her port anchor; two crew members were located on the bow in the vicinity of the anchor, see Finding of Fact # 31. It is undisputed that the anchor could have been "let go" in approximately two minutes, see Finding of Fact # 31. Under the circumstances, the Wilmington Getty had ample time to "let go the anchor chain" after observing the Ponce De Leon on radar and after the radio communication which took place at 1311 on May 10, 1973 and thereby avoid a collision.

In *Villain & Fassis E. Compania v. Tank Steamer E. W. Sinclair*, 207 F.Supp. 700 (S.D.N.Y.1962), it was said:

"Where a vessel apprehends danger *and does nothing within her power to avoid or mitigate a collision*, she is hardly discharging her duty to take the precautions required by the *special circumstances* of the case." 207 F.Supp. 700 (S.D.N.Y.1962) at 710, 711. (Emphasis added.)

The Wilmington Getty was guilty of fault in failing to properly utilize its radar upon sighting the Ponce De Leon. The applicable statutes and case law dealing with the failure to make a manual plot was discussed earlier, and a repetition of this law is unnecessary.

It should be noted that counsel for the Wilmington Getty has cited numerous cases to sustain its position that none of the aforementioned failures on its part constitutes fault. These cases were decided prior to the decision in *Reliable*. This court has stated its opinion as to the effects of *Reliable* on cases formerly held to be stare decisis in the area of maritime collision. Consequently, in light of *Reliable*, this court cannot excuse nor overlook the faults or omissions of the Wilmington Getty.

Accordingly, I find that the Wilmington Getty was guilty of fault which was a proximate cause of the collision which took place on May 10, 1973 at approximately 1314.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and subject matter of this case.

2. The Wilmington Getty and the Ponce De Leon were each at fault in the collision which occurred at Ambrose Channel on May 10, 1973, at 1314 hours.

3. Getty Oil Company (Eastern Operations), Inc. is entitled to an interlocutory decree against SS Ponce De Leon, her engines, tackle, etc., Sun Leasing Co. and Transamerican Trailer Transport, Inc. for 80% of the damage sustained by the Wilmington Getty as a result of the collision, together with costs and such interest, if any, as this court may determine upon the entry of the final decree herein.

4. The Sun Leasing Co. and Transamerican Trailer Transport, Inc. are entitled to an interlocutory decree against Getty Oil Company (Eastern Operations), Inc. for 20% of the damages sustained by the Ponce De Leon as a result of the collision, together with costs and such interest, if any, as this court may determine upon the entry of the final decree herein.

5. The amount of damage to the respective vessels will be determined by this court.

Submit interlocutory decree on notice in accordance with the foregoing.