555 F.2d 328
 GETTY OIL COMPANY (EASTERN OPERATIONS), INC.,
Plaintiff-Appellant-Cross-Appellee,
v.
SS PONCE DE LEON, her engines, tackle, etc., Sun Leasing
Co., and Transamerican Trailer Transport, Inc.,
Defendants-Appellees-Cross-Appellants.
 Nos. 845, 971, Dockets 76-7575, 76-7599.
 United States Court of Appeals,
Second Circuit.
 Argued April 13, 1977.
Decided May 16, 1977.
 
 Lawrence J. Bowles, New York City (Kirlin, Campbell & Keating, New York City, Richard H. Brown, Jr., New York City, of counsel), for plaintiff-appellant-cross-appellee.
 Lawrence J. Mahoney, New York City (Dougherty, Ryan, Mahoney, Pellegrino & Giuffra, New York City, Vincent J. Barra, New York City, of counsel), for defendants-appellees-cross-appellants.
 Before CLARK, Associate Justice,* and MOORE and MULLIGAN, Circuit Judges.
 MULLIGAN, Circuit Judge:
 
 
 1
 On the early afternoon of May 10, 1973 in a dense fog in New York harbor there was a collision between the "Wilmington Getty", a vessel owned by the plaintiff Getty Oil Company (Eastern Operations), Inc. (Getty) and the "Ponce De Leon", a vessel owned by the defendant Sun Leasing Co. and operated by the defendant Transamerican Trailer Transport, Inc. Both vessels were damaged. The ensuing admiralty claim was brought by Getty in the United States District Court for the Southern District of New York and was tried before Judge Richard H. Levet on September 19, 1975 without a jury. The court's 29-page opinion, findings of fact and conclusions of law dated March 5, 1976 reported at 409 F.Supp. 909, held that both vessels were at fault. The court determined that the Ponce De Leon was liable for 80% and the Wilmington Getty for 20% of the damages.[1] Getty has appealed, urging that the Ponce De Leon was solely at fault or, in the alternative, that it was 95% at fault. Sun Leasing Co. and Transamerican Trailer Transport, Inc. have cross-appealed, submitting that a finding of 70% to 75% responsibility as against Ponce De Leon would be appropriate under the circumstances. We affirm the judgment below and dismiss the cross-appeal.
 
 
 2
 * The salient facts found by the district court follow: The Wilmington Getty is a steam tanker 13,659 gross tons, 583.5 feet in length and 74.2 feet in breadth. On the morning of May 10, 1973 she was on a voyage from Delaware City, Delaware to Bayonne, New Jersey laden with a cargo of 20,000 tons of heating oil and gasoline. The Ponce De Leon is a steamship of 15,134 gross tons, 700 feet in length and 92.2 feet in breadth. On the morning of May 10, 1973 she was laden with a cargo of trailers and was on a voyage from San Juan, Puerto Rico to the Transamerican Terminal at Staten Island, New York.
 
 
 3
 On that morning the Wilmington Getty was proceeding up Ambrose Channel in a dense fog which had caused a congestion of vessels seeking ingress to the harbor. In view of the crowded anchorage areas, her master decided to anchor outside the normal location and at 0856 anchored the vessel at Norton's Point, Brooklyn with three shots (290 feet) of anchor chain in the water. The court found this position to be hazardous since it was not a usual or customary place of anchorage for vessels awaiting inclement weather conditions to improve. The normal location, known as Anchorage 25, was located at the head of the customary navigable throughway used by vessels approaching the only safe anchorage after exiting Ambrose Channel at Buoy 18. Upon anchoring the master of the Wilmington placed the vessel's engines at the position "Finished With Engines" (F.W.E.) which would require about three to five minutes to get the vessel underway. Had the engines been placed on "Standby Engines" she would have been capable of immediate movement. The Wilmington Getty's watch officer was not advised of the status of the engines when he relieved the watch. A security call advising all vessels in the vicinity of the Wilmington Getty's anchorage position was transmitted immediately upon anchoring, but was not repeated by that vessel at any time before the collision.
 
 
 4
 At about 1146 on May 10, 1973, the Ponce De Leon arrived at the Ambrose Light Tower and proceeded up the channel sounding its fog horn at less than one minute intervals. By approximately 1300 hours the Wilmington Getty had swung with the tide to a position which was different than that initially signalled and in close proximity to the outer perimeter of Ambrose Channel. The master of the Ponce De Leon, learning that his tugs were fogbound at about 1300, decided to leave the channel and anchor in Anchorage Area 25 until weather conditions improved. Just prior to coming abeam of Buoy 18 the master of the Ponce De Leon observed a target (the Wilmington Getty) at the extreme edge of his radar which was set at a two mile scale. At this point the Ponce De Leon was travelling at 10.5 to 11 knots which the court found to be excessive under the weather and traffic conditions which prevailed. The court further found that the master of the Ponce De Leon should have known that the Wilmington Getty was located outside the main shipping channel.
 
 
 5
 At about 1308-09 the Ponce De Leon had reached Buoy 18 and changed her course to permit her to leave the channel for anchorage. At the same time she was observed on radar by the watch officer of the Wilmington Getty who considered her to be a "threat" to his vessel. He continued to observe the Ponce De Leon on radar until the time of the collision but he made no manual plot of her movements. After the Ponce De Leon turned out of Ambrose Channel there was a radio conversation between the two vessels at about 1311. The watch officer of the Wilmington Getty informed the Ponce De Leon that his vessel was at anchor off Norton Point. The master of the Ponce De Leon replied that his vessel would pass between the Wilmington Getty and Norton Point. At that time the vessels were .5 to .6 miles apart. The district court found that in travelling from Buoy 18 to the point of collision, the Ponce De Leon was proceeding at an excessive rate of speed averaging 12 knots.
 
 
 6
 The Wilmington Getty was anchored with her port anchor and the anchor chain was secured by a pawl and wheel brake. The anchor could have been "let go" by lifting the pawl and turning the wheel brake which could have been accomplished in about two minutes and would have permitted the Wilmington Getty to drift astern with the current and away from the ultimate point of collision. There was no proof at trial to show that the crew of the Wilmington Getty made any effort to release the anchor brake before the collision.
 
 
 7
 The master of the Ponce De Leon visually sighted the Wilmington Getty "just seconds" before the collision at a distance of between 25 to 100 feet. He ordered a hard left in an effort to swing the stern of the Ponce De Leon away from the anchored vessel. Had the Ponce De Leon's engines been backed full speed astern, it would not have been able to stop before the collision by reason of its excessive speed. At about 1314 hours the Ponce De Leon collided with the Wilmington Getty causing damage to the Wilmington Getty's bow and the Ponce De Leon's port side.
 
 
 8
 The court made the following findings as to liability, 409 F.Supp. at 914-15:
 
 
 9
 39. In the opinion of the court, the Ponce De Leon contributed to the collision by the following acts:
 
 
 10
 1. The speed of the Ponce De Leon was excessive from Buoy 18 to the point of collision;
 
 
 11
 2. The Ponce De Leon failed to make a manual plot on its radar upon first sighting the Wilmington Getty;
 
 
 12
 3. The Ponce De Leon failed to stop her engines upon first hearing the fog signal of the Wilmington Getty or upon first observing the Wilmington Getty.
 
 
 13
 40. In the opinion of the court, the Wilmington Getty contributed to the collision by the following acts:
 
 
 14
 1. The failure of the Wilmington Getty to issue additional security calls after anchoring;
 
 
 15
 2. The failure of the Wilmington Getty to keep her engines on "Standby" while anchored in a hazardous locale;
 
 
 16
 3. The failure of the Wilmington Getty to make a manual plot after observing the Ponce De Leon on radar;
 
 
 17
 4. The failure of the Wilmington Getty to "let go the anchor chain" after observing the Ponce De Leon on radar.
 
 II
 
 18
 A key question upon this appeal is whether the court below properly interpreted United States v. Reliable Transfer Co., 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the landmark decision of the Supreme Court which overthrew the more than a century old rule of divided damages in admiralty law. That ancient rule, applied most commonly in cases of collision between two vessels, had been previously rejected by every major maritime nation. It provided that whenever both parties were found to be guilty of contributory fault, whatever the relative degree of their fault may have been, there was an equal division of property damage. Mr. Justice Stewart writing for a unanimous court in Reliable finally jettisoned the concept, id. at 411, 95 S.Ct. at 1715:[2]
 
 
 19
 We hold that when two or more parties have contributed by their fault to cause property damage in a maritime collision or stranding, liability for such damage is to be allocated among the parties proportionately to the comparative degree of their fault, and that liability for such damages is to be allocated equally only when the parties are equally at fault or when it is not possible fairly to measure the comparative degree of their fault.
 
 
 20
 In tracing the history of the divided damages rule, Justice Stewart adverted to the fact that the Court had long recognized the harshness of an equal division rule by applying the so-called "major-minor" fault doctrine to find a grossly negligent party solely at fault. In the course of this discussion, id. at 406 n.12, 95 S.Ct. at 1713, n.12, he cited City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84 (1893) as illustrative of that rule:
 
 
 21
 Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor.
 
 
 22
 Appellant urges the good sense behind this principle and argues that it be applied here. However Justice Stewart, after adverting to the doctrine, continued in his opinion to state, 421 U.S. at 406, 95 S.Ct. at 1713:
 
 
 23
 But this escape valve (the major-minor fault doctrine), in addition to being inherently unreliable, simply replaces one unfairness with another. That a vessel is primarily negligent does not justify its shouldering all responsibility, nor excuse the slightly negligent vessel from bearing any liability at all.
 
 
 24
 We can only conclude that the Reliable stands for the proposition that in cases such as this the district court is obliged to apportion the damages even if one vessel is primarily responsible for the loss and the other is only slightly negligent. Hence, we conclude that Judge Levet was correct in determining that slight fault cannot be overlooked and that cases applying the major-minor rule are no longer viable after the Reliable decision.[3] Now that the Court has finally abolished the rule of divided damages and has clearly articulated one of comparative negligence with proportional allocation of fault, we see no reason or sense in making exceptions thereto. To do so here would be particularly inappropriate since the major-minor rule now espoused did not go unnoticed by the Court but was recognized as a response to the patent harshness of the divided damages rule which itself was illogical and unfair. We read Reliable as a rejection not only of divided damages but as a repudiation of its illicit progeny, the major-minor approach.[4]
 
 III
 
 25
 There is a second issue of major significance on this appeal upon which the parties sharply disagree and which the Reliable opinion did not address. Is the determination of the allocation of fault, in this case 80% to the Ponce De Leon and 20% to the Wilmington Getty, a question of fact to be tested by the "unless clearly erroneous" rule on appeal or is it an issue of law permitting a full appellate review? The Seventh Circuit recently had occasion to address this question in a post-Reliable context in Feeder Line Towing Service, Inc. v. Toledo, P. & W. R. R. Co., 539 F.2d 1107 (1976). The court there stated:Defendant attacks the district court's apportionment of fault, advancing basically three arguments. In reviewing the district court's decision, we are mindful that ". . .. We may not set aside the trial court's findings unless they are clearly erroneous."
 
 
 26
 Id. at 1110 (footnote and citation omitted). We agree and hold that the issue of fault allocation is a question of fact subject to the clearly erroneous test on appeal.
 
 
 27
 The Reliable litigation itself arose out of the stranding of a tanker. After a bench trial before the late Orrin G. Judd, District Judge for the Eastern District of New York, the court found that the stranding was caused 25% by the negligence of the Coast Guard in its failure properly to maintain a breakwater light and 75% by the negligence of the vessel in making a U-turn in a dangerous channel when the captain knew that the breakwater light was not operating. Under the then controlling rule he held that each party should bear half of the damages. In our per curiam affirmance, 497 F.2d 1036, 1037-38 (1974), we stated: "We hold that the court was not clearly erroneous in finding that the negligence of both parties, in the proportions stated, caused the stranding." It would thus appear that this court believed that the clearly erroneous test was applicable to the allocation of the fact finder.
 
 
 28
 The Government's petition for certiorari presented the single issue of whether the admiralty rule of equally divided damages should be replaced by a rule of damages in proportion to fault. The respondent tanker did not file a cross-petition for certiorari but argued in the Supreme Court that the Government was solely at fault. The Court held that the respondent could not challenge the judgment of the Court of Appeals to enlarge its rights and further commented, "The findings of fact with respect to comparative negligence were concurred in by both the District Court and the Court of Appeals." 421 U.S. at 401 n.2, 95 S.Ct. at 1711 n.2. Thus, albeit without discussion, both the Supreme Court and this court considered the allocation an issue of fact.[5]
 
 
 29
 Persuasive, in our view, is the analogy to the admiralty rule in personal injury cases where it is well established that the allocation of comparative fault is a question of fact and therefore tested by the clearly erroneous rule. The Jones Act, 46 U.S.C. § 688, provides that a seaman who has been injured or dies in the course of his employment has an action for damages comparable to that of railway employees. 45 U.S.C. § 53 provides that in personal injury cases involving railway employees the contributory negligence of the employee does not bar a recovery, "but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." The statute therefore clearly provides that the fact finder is to make the allocation and on appeal that determination is tested by the clearly erroneous rule.[6]
 
 
 30
 While the demise of the divided damages rule was judicial and not congressional, the Court in Reliable noted, "No statutory or judicial precept precludes a change in the rule of divided damages, and indeed a proportional fault rule would simply bring recovery for property damage in maritime collision cases into line with the rule of admiralty law long since established by Congress for personal injury cases. See the Jones Act, 46 U.S.C. § 688." 421 U.S. at 409, 95 S.Ct. at 1715 (footnote omitted). The Court earlier in its opinion noted, "and in our own admiralty law a rule of comparative negligence has long been applied with no untoward difficulties in personal injury actions." Id. at 407, 95 S.Ct. at 1714. If the analogy made by the Court is to be applied with symmetry, we believe that the allocation of fault in a collision or stranding case should be a question of fact for the jury, or the court where there is no jury, just as it is in a seaman's injury case under the Jones Act and subject therefore to the clearly erroneous standard. It would indeed be anomalous in a field of law now sufficiently complex to have a different standard of review, where the same theory of comparative negligence is applicable regardless of whether the injuries be to a seaman or a vessel.
 
 
 31
 The appellant Getty argues that allocations of negligence are reviewable as a matter of law and are not protected by the clearly erroneous test. However, the only authority cited for this proposition is Mamiye Bros. v. Barber S.S. Lines, Inc., 360 F.2d 774, 777-78 (2d Cir.), cert. denied,385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966). That case presented no allocation of fault issue. The court adhered to the traditional view of this circuit, which we follow, that there will be a free review of the ultimate determination of the existence of negligence although not of the facts upon which it was based. As we apply the rule here, Judge Levet's determination that either ship was guilty of some fault is fully reviewable but his estimate of the amount of negligence attributable to each is subject to the clearly erroneous rule. Thus if in this case, assuming no clearly erroneous findings of fact, we may fully review Judge Levet's conclusion that the Wilmington Getty as well as the Ponce De Leon were each negligent in some degree, his approximation of the degree of fault will not be disturbed unless it is clearly erroneous. The mere fact that we may disagree with the allocation will not be sufficient to set it aside unless we are left with the definite and firm conviction that a mistake has been committed after reviewing the entire evidence. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Romero v. Garcia & Diaz, Inc., 286 F.2d 347, 356 (2d Cir.), cert. denied, 365 U.S. 869, 81 S.Ct. 905, 5 L.Ed.2d 860 (1961).
 
 IV
 
 32
 Applying the principles of review to the record before us we find no clearly erroneous findings of fact and do not disagree with the conclusions of law reached below. Judge Levet's opinion carefully and thoroughly details the significant facts which led to the collision and ensuing damage. Moreover, he did have the benefit of observing the expert witnesses who appeared before him. There is no doubt, and appellees concede, that the Ponce De Leon here was principally at fault. She was the moving vessel travelling at an excessive rate of speed in a dense fog with visibility best described as "nil." 409 F.Supp. at 917. She was unable to stop within the distance another vessel became visible and with which she was in danger of collision. Tuxedo, 77 F.2d 354, 355 (2d Cir. 1935). While appellants claim further embellishments of fault on the part of the Ponce De Leon, basically those found below establish her prime liability.
 
 
 33
 As we perceive this appeal the basic issue is whether the Ponce De Leon was solely at fault and if not, whether the court below was clearly erroneous in finding her liability only four times that of the Wilmington Getty. Hence, we focus on the liability, if any, of the plaintiff's tanker. There is no doubt that under normal circumstances an anchored vessel is entitled to rely on moving vessels avoiding her. Charles Hubbard, 229 F. 352 (6th Cir. 1916). However, the court below properly found that the situation on the day in question, rather than being normal, was in fact highly precarious in view of the heavy fog and the resulting congestion in New York harbor which precluded vessels from obtaining anchorage at usual positions. While the district court found no negligence in the Wilmington Getty's dropping anchor at the location selected by her skipper, we cannot find the court to have been wrong in also concluding that in view of the traffic and the fog the Wilmington Getty had further obligations to issue additional security calls after anchoring and to keep her engines on "Standby" to permit instant movement. At 1308, Third Mate Farrago of the Wilmington Getty did observe the Ponce De Leon on radar and considered her a menace, yet no manual plot of her movements was ever made. Appellant makes much of the fact that at about 1311 there was a radio communication between the vessels some 3 to 5 minutes before collision at which time the Wilmington Getty advised that it was anchored and the master of the Ponce De Leon indicated that it was his intent to pass between that vessel and Norton Point. While this is viewed by appellant as an assurance that all would be well, realistically in view of the fog it should have alerted the Wilmington Getty that some evasive action might reasonably be necessary as the other vessel approached. Had the anchor been "let go" by lifting the pawl and turning the wheel brake, which could have been done in about 2 minutes, the drift would have given the Ponce De Leon more space to pass. Concededly, this was not done. Had the engines been set on "Standby" immediate movement would have permitted the Ponce De Leon a wider berth. The collision was not inevitable but was in fact a "near miss" the Ponce De Leon was two-thirds clear of the Wilmington Getty but collided with her anchor chain dragging her bow into contact with the Ponce De Leon's port side aft.
 
 
 34
 In sum, we agree with the court below that although the negligence of the Ponce De Leon in proceeding at immoderate speed in dense fog knowing the position of the Wilmington Getty was clearly the major cause of the accident, the latter vessel was not blameless. She was in the path of the traffic of vessels which had to make similar anchorage decisions in view of the fog, and she should have been in a state of readiness to avoid possible collision in view of the lack of visibility. In this situation there was a duty of vigilance. Richmond, 63 F. 1020, 1022 (2d Cir. 1894); Sun Oil Co. v. S.S. Georgel, 245 F.Supp. 537, 545 (S.D.N.Y.1965), aff'd, 369 F.2d 406 (2d Cir. 1966) (per curiam).
 
 
 35
 The calibration of fault in this as in other cases is not capable of any real precision. After studying the record one is persuaded that the fault of the Ponce De Leon was grievous and that of the Wilmington Getty slight. Assessing the proportionate blame is a question of fact and we cannot find the determination below that the Ponce De Leon's fault was four times that of the Wilmington Getty to be clearly erroneous. The judgment below is affirmed and the cross-appeal dismissed.
 
 
 
 *
 Tom C. Clark, Associate Justice, United States Supreme Court, Retired, sitting by designation
 
 
 [1]
 On September 30, 1976 a hearing on damages was held at which it was stipulated that plaintiff, found to have been 20% at fault, incurred damages of.$146,000 and that defendants, found to have been 80% at fault, incurred a loss of $234,000. Plaintiff was therefore entitled to recover $116,800 (80% of.$146,000), and defendants were to receive $46,800 (20% of $234,000). Plaintiff was awarded the net balance of $70,000 plus interest for a total of $84,350, and judgment for that sum was entered on October 22, 1976
 
 
 [2]
 Mr. Justice Stewart's opinion, 421 U.S. at 404 n.10, 95 S.Ct. 1708, lists several Second Circuit cases which had followed the equal division of damages rule with an ill disguised reluctance. Mystic S.S. Corp. v. M/S Antonio Ferraz, 498 F.2d 538, 539 n.1 (2d Cir. 1974); In re Adams' Petition, 237 F.2d 884, 887 (2d Cir. 1956), cert. denied, 352 U.S. 971, 77 S.Ct. 364, 1 L.Ed.2d 325 (1957); Luckenbach S.S. Co. v. United States, 157 F.2d 250, 252 (2d Cir. 1946). Reliable itself was an appeal from this circuit in which the court indicated its dissatisfaction with the rule but preferred to leave any doctrinal development of this significance in admiralty law to the Supreme Court or appropriate congressional action. 497 F.2d 1036, 1038 (2d Cir. 1974)
 
 
 [3]
 Appellant in its brief argues that "(o)ne danger stemming from Reliable is that it will encourage a vessel at fault and sustaining heavy damages (such as the PONCE DE LEON) to litigate against even an anchored vessel in the hope that, if a small percentage of fault is attributed to the anchored vessel, this will greatly reduce perhaps eliminate the payment by the vessel grossly at fault." The division of damages here is set forth in n. 1, supra
 The short answer to appellant's argument is that the Reliable, which at long last announced the comparative negligence rule, made no distinction based on the amount of damage suffered by either vessel. The Court expressed its disapproval of the major-minor rule now sought to be reintroduced by the appellant. The argument that the divided damages rule promoted settlements and thus eliminated calendar congestion (which is the basis for appellant's argument here) was answered by Mr. Justice Stewart: "Congestion in the courts cannot justify a legal rule that produces unjust results in litigation simply to encourage speedy out-of-court accommodations." 421 U.S. at 408, 95 S.Ct. at 1714.
 The only exception which the Court in Reliable permitted to the rule of allocation based on comparative fault is the case where it is not possible fairly to measure the comparative degree of fault. Id. at 411, 95 S.Ct. 1708. Neither party claims that such a situation exists here.
 
 
 [4]
 The only case law discussion of this issue which we have unearthed is in People of State of Cal. v. Italian Motorship Ilice, 534 F.2d 836, 840 (9th Cir. 1976) which declined to follow the major-minor rule under the facts of that case since the court below had found that the fault of the State was one of the proximate causes of the collision there in issue. The court did note in dicta that the major-minor rule was one of evidence and distinguishable from the Reliable rule which it termed a substantive rule of admiralty. If this comment was intended to suggest that the rule has continuing validity, we decline to follow it. Recent commentators have predicted that as a result of Reliable the major-minor rule "will presumably be discarded", Healy & Koster, Reliable Transfer Company v. United States: Proportional Fault Rule, 7 J. Maritime L. & Com. 293, 295 (1975), or is "probably now obsolete." Note, 50 Tul.L.Rev. 148, 152 (1975)
 
 
 [5]
 In Navieros Oceanikos, S.A. v. S. T. Mobil Trader, 554 F.2d 43 (2d Cir. 1977), a recent opinion of this court involving the loss of a ship due to fire caused by an overflow of oil being pumped aboard, the district court allocated liability 75% and 25% among the parties involved. In affirming, the majority found the findings of fact not clearly erroneous. Id. at 45. Judge Mansfield in his dissent, based on his view that an indemnity agreement was applicable, noted: "Under the circumstances the allocation of 25% of the blame to the supplier (Mobil Sales and Mobil Oil Corp.), while not clearly erroneous, is rather high." Id. at 49 n.1
 
 
 [6]
 In Rogers v. Gracey-Hellums Corp., 442 F.2d 1196 (5th Cir. 1971) (per curiam), the court affirmed a finding in an action under 46 U.S.C. § 688 that the plaintiff seaman was 662/3% responsible and the defendant was 331/3% at fault since it was "unable to find that the allocation of fault was clearly erroneous." Id
 The estimation of such percentage allocations is but another form of approximation that is done in the area of damages as a matter of course, G. Gilmore & C. Black, The Law of Admiralty 529 (2d ed. 1975), and we are not free to disregard factual findings on the issue of damages "unless we are satisfied that they are clearly erroneous." Hildebrand v. United States, 226 F.2d 215, 216 (2d Cir. 1955) (per curiam). See also Haynes v. Rederi A/S Aladdin, 362 F.2d 345, 348-49 (5th Cir. 1966), cert. denied, 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557 (1967); Mason v. United States, 177 F.2d 352, 354 (2d Cir. 1949) (per curiam).