KING FISHER MARINE SERVICE,
INC., Plaintiff-Appellee,

v.

PETROLEOS MEXICANOS, Owner, SS
PRESIDENTE CARRANZA, her en-
gines, tackle, etc., Defendant-Appellant.

No. 28002.

United States Court of Appeals,
Fifth Circuit.

July 8, 1970.

Benjamin S. Hardy, Hardy & Sharpe, Brownsville, Tex., for defendant-appellant.

M. Harvey Weil, Kleberg, Mobley, Lockett & Weil, Corpus Christi, Tex., for plaintiff-appellee.

Before RIVES, GEWIN and INGRAHAM, Circuit Judges.

INGRAHAM, Circuit Judge:

Petroleos Mexicanos, a governmental corporation wholly owned by the United States of Mexico and owner of the SS Presidente Carranza, a bulk tanker 547 feet by 70 feet, with a loaded draft of 31 feet, appeals from a judgment finding it solely at fault for the collision between its ship and the Leonard Fisher, a dredge owned by appellee King Fisher Marine Service, Inc., 120 feet by 34 feet, with a draft of 8 feet. The appellant

asserts that the trial judge's findings of fact are clearly erroneous, and that his assessment of damages in the amount of $135,598.53 with interest at six percent from September 1, 1967, is erroneous both in law and in fact.

The collision occurred in the Brownsville, Texas, Ship Channel on September 1, 1967. The dredge Leonard Fisher was engaged in maintenance dredging operations along the channel under contract with the United States Corps of Engineers, and on the date of the collision had completed approximately 9½ miles of the 10-mile project. The collision occurred as the tanker negotiated a turn in the channel. The evidence is uncontroverted that at the time of the collision, the dredge, which had been working in the channel, had moved to its starboard or south side of the channel and was stationary, with its cutterhead firmly on the bottom against the channel side-slope, its starboard spud down in the side-slope, and its starboard anchor cable taut. (This was standard procedure for the dredge when a ship passed through the channel.) It is also uncontroverted that the pilot and captain of the tanker were clearly aware of the dredge's position and that the dredge assumed its position well in advance of the tanker's approach.

The collision resulted from the fact that, in negotiating the turn, the stern of the tanker swung too close to the starboard or north bank, and encountered suction created by the proximity of its own propellers and the bank. Thus, the stern was drawn toward the bank. This caused the bow to swing toward the port or south bank of the channel and collide with the stationary dredge. The following statement of the trial judge indicates why he found the pilot of the tanker at fault: "(a) knowing he had to pass Buoy No. 5 close to port in order to avoid suction from the starboard bank (a danger to be anticipated and avoided) he failed to consider, or misjudged, the strength of the tide and its effect upon the ship; and (b) he failed to give the order for left 20 degree rudder and left full rudder soon enough thus allowing the vessel to take suction from the starboard bank." No fault was found against the dredge which was working in a fixed position on the south bank of the channel, and its position was known and clearly marked.

■ The appellant contends that the court was manifestly wrong in placing sole fault on the SS President Carranza.

Because of the terms of the contract between the dredge owner and the Army Corps of Engineers, the theory of a stationary vessel being struck by a moving vessel does not apply. The contract provides that the dredge conduct the work:

* * * in such a manner as to obstruct navigation as little as possible, and in case the Contractor's plant so obstructs the channel, as to make difficult or endanger the passage of vessels, said plant shall be promptly moved on the approach of any vessel to such an extent as may be necessary to afford a practicable passage.

The appellant argues that the position which the dredge took created a hazardous and dangerous situation and that the dredge failed to move quickly enough when the critical situation occurred. Appellant also argues that because of the respective drafts of the ships, the dredge could have moved into water so shallow that it could not have been hit. Appellant points out that the dredge violated Coast Guard Regulations 33 CFR, Section 95.51, and Pilot Rules for Inland Waters, Sec. 80.29 in failing to position deploy lighted or marked anchor buoys. Appellant also contends that the dredge had no captain at the time of the collision, was undermanned, and as such must be considered unseaworthy.

In response to the above arguments, appellee recounts in detail precisely how the accident occurred. It points out that both the captain of the tanker and the leverman on the dredge agree that the dredge was outside the 200 foot wide navigation channel when the collision oc-

curred. Appellee cites, and we accept, a case which appears to be very similar, The Ditmar Koel, 65 F.2d 555 (5th Cir. 1933), which involved a collision between a steamship and a dredge where the dredge did not move out of the marked channel. The court noted that the pilot was aware of the presence of the dredge and this required careful navigation at moderate speed. The main distinction is that speed was not a factor in the instant case.

 We find the damages assessed by the district court to be fully supported. The dredge was involved in operations for the Corps of Engineers when the collision occurred. Under the terms of their agreement, the job was to be inspected in sections when the work on a section of the canal was complete. While the dredge was being repaired, hurricane Beulah destroyed much of the work which the dredge had done on the last section of the job and this work had to be redone. The evidence indicates that if the collision had not occurred, the work would have been completed long before the hurricane struck. The court compensated appellee for the cost of the work which had to be redone. Appellant insists that the hurricane was not foreseeable, was an "act of God" and that appellant should not have to compensate for damages caused by such an act. There is evidence in the record to show that hurricanes are definitely foreseeable along the Gulf Coast during the months of September and October. The court seems to have based its decision on this fact.[1]

■ Appellant attacks the award of $798.84 for loss of a skiff and motor. But the record supports the loss and value.

■ Appellant contends that the trial court erred in assessing $10,000 in damages for replacement of a trunnion. Appellee points out that because of the type of work performed by the trunnion, it was impossible to repair by welding, that welding had been attempted by an expert welder and was not sufficient to stop the leaks. Complete replacement was required. These findings are supported by the record.

The standards of McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20, are clearly met and we must affirm. We cannot conclude, from the record, that the findings of the district court are "clearly erroneous". We are of the opinion that such findings are fully supported and correct.

The judgment of the district court is affirmed.

---

1. "One is chargeable with knowledge of the usual effect of ordinary natural conditions or forces upon his negligent act or omission, and is held to have contemplated the appearance and the effect of such conditions and forces upon his negligence." The Mariner. Jacobson v. Suderman & Young, Inc., 5 Cir. 1927, 17 F.2d 253, 254.