In the Matter of the Complaint of HESS TANKSHIP COMPANY, Owner, and Amerada Hess Corporation, as Bareboat Charterer and Owner Pro Hac Vice, of the STEAMSHIP HESS REFINER, for Exoneration from or Limitation of Liability.

ALLIED CHEMICAL CORPORATION

v.

HESS TANKSHIP COMPANY OF DELAWARE, et al.

ALLIED CHEMICAL CORP.

v.

LONDON STEAMSHIP OWNERS MUTUAL INS. ASSN., LTD., et al.

HESS TANKSHIP COMPANY, et al.

v.

ALLIED CHEMICAL CORPORATION, et al.

HESS TANKSHIP COMPANY, et al.

v.

The VESSEL XYZ, etc., et al.

HESS TANKSHIP COMPANY, et al.

v.

The UNITED STATES of America.

Civ. A. Nos. 73–2020, 73–343, 74–186, 74–304, 74–1274 and 74–2186.

United States District Court, E. D. Louisiana.

June 19, 1979.

Charles E. Lugenbuhl, Wm. J. Larzelere, Jr., New Orleans, La., for Allied Chemical Corp., DeFelice Towing Co., Savare DeFelice and DeFelice Marine Contractors, Inc.

John W. Sims, J. Barbee Winston, Antonio J. Rodriguez, New Orleans, La., for Hess Tankship Co. and Amerada Hess Corp.

Hugh S. Meredith, Norfolk, Va., Alfred M. Farrell, Jr., New Orleans, La., for Allied Towing Corp.

David A. Paysse, New Orleans, La., for Certain British Underwriters.

Clayton G. Ramsey, Washington, D.C., for United States of America.

Robert B. Deane, New Orleans, La., for Great Fortune Navigation, Ltd.

## MEMORANDUM OPINION

EDWARD J. BOYLE, Sr., District Judge:

On the morning of February 1, 1973, the SS HESS REFINER and a barge in the tow of the tug SOCRATES collided in the Mississippi River in Southwest Pass. Minutes following impact between the bow of the vessel and the starboard side of the barge near its stern, the skin of the HESS REFINER on the starboard side aft was pierced below the water line by a submerged metal object which entered the vessel causing flooding of an oil bunker tank and the lower engine room.

This accident has given rise to the usual claims by and between the vessels involved and their respective owners, charterers, and underwriters seeking adjudication as to the cause of the casualty and the recovery of damages sustained as a result thereof. In addition, as the result of the contact between the HESS REFINER and the submerged object, we are faced with more novel issues. Specifically, the HESS REFINER interests claim that the metal object which pierced the vessel was a portion of the rub rail of the M/V T-TRUC # 1 which sank in the area following collision with the M/V GREAT FAITH on May 10, 1972. Recovery is sought against both parties to that collision and against the United States for their alleged failures to mark or remove the sunken wreck and/or to keep the channel clear.

The owners of the vessels involved in the February 1, 1973 ship-barge collision deny liability for it and charge each other with sole fault. The owner of the T-TRUC # 1 denies that the offending metal object formed a part of the T-TRUC, which he was unable to locate following her sinking and subsequently abandoned. The owner of the GREAT FAITH denies that it had any duty to mark or remove the wreck and

is joined in that position by the United States. The parties and claims involved in these consolidated lawsuits are set out in detail in the Appendix to this opinion.

Trial, restricted to the issue of liability, took place before the Court on a former day. Evidence was directed to the two central factual issues herein—first, the cause or causes of the February 1, 1973 collision and, second, the identity of the metal object.

After careful consideration of all the evidence adduced at trial, the comprehensive memoranda of counsel, and the applicable law, we conclude that the collision between the HESS REFINER and the SOCRATES' tow resulted from the combined fault of the two vessels. Damage to the HESS REFINER sustained by contact with the metal object was a proximate and direct result of the initial collision and should be considered as part of the total measure of damages to be apportioned between the parties at fault. Accordingly, we need not attempt to unravel the mystery of the origin and/or identity of the metal object, nor must we address the legal issues attendant to the claims for failure to mark or remove a wreck.

## THE FACTS

The SS HESS REFINER is a jumboized T-2 tanker approximately 605 feet in length and 75 feet in breadth and drawing, on the date of the casualty herein, 32 feet 1 inch forward and 34 feet 7 inches aft. The vessel is owned by Hess Tankship Company and bareboat chartered by Amerada Hess Corporation (hereinafter collectively Hess).

The SOCRATES is a 125 foot seagoing tug equipped with twin pilot-house controlled engines having a total of 3200 h.p. The tug's draft was 14 feet. The SOCRATES is owned by Allied Towing Corporation (Allied Towing).

The barge ALLIED CHEMICAL No. 44 (AC-44) is owned by Allied Chemical Corporation [1] (Allied Chemical) and measures

---

1. Despite the similarity in their names, there is no relationship between Allied Chemical and Allied Towing other than that occasioned by the fact that the SOCRATES was engaged in towing the AC-44. Transcript, Vol. 8, p. 164).

some 340 feet in length and 68 feet in width. On the date in question the AC–44 was drawing approximately 17 feet forward and 18 feet aft.

Early on the morning of January 31, 1973, the SOCRATES departed the Allied Chemical dock at Geismer, Louisiana, with the AC–44 which was loaded with liquid fertilizer. The SOCRATES was made up to the stern of the barge pushing it. The bow of the tug notched into the stern of the barge some 10 feet creating a flotilla of 455 feet in length. Headed downriver, bound for the Gulf of Mexico, the tug had a full crew and operational VHF radio, radar, lights, and sound signal devices. The weather was clear and visibility good.

At some point between Pilottown and Beacon # 26 (located somewhat more than three miles below the Head of Passes on the east or left descending bank), Captain Robert Scott of the SOCRATES spoke via radio channel 13 to river pilot Daniel Meyers aboard the upbound vessel AVAX.[2] At this time he was informed that there were high winds and 10–12 foot seas on the bar beyond the pass. Wishing to avoid the rough weather outside, Captain Scott, at 2045 hours E.S.T. (1945 C.S.T.)[3] rounded up his tow and pushed into the west bank of the pass. The weather remained clear.

The captain positioned the tow approximately one quarter nautical mile below a dike located on the west or right descending bank 3.05 statute miles below the Head of Passes (dike 3.05) and abeam of Beacon 26 on the east bank. The tow, headed north or upriver, was angled in toward the west bank. The vessel's heading as shown on the gyro was 355–359 degrees. The port bow of the AC–44 was believed to be aground.

The tug was holding the barge in to the bank by use of its engines which were kept at half ahead with rudders set at 20–30 degrees to port against the 3½ to 4 knot current. The flotilla was lighted in accordance with applicable rules governing a tug and tow underway.

At the point at which the SOCRATES held up, the Mississippi is approximately 2000 feet wide bank to bank. A dredged channel 40 feet in depth is maintained by the U.S. Army Corps of Engineers approximately mid-way between the tanks. The dredged channel is approximately 700 feet in width and is unmarked by buoys. At all times pertinent hereto, the level of water in the pass was four feet above mean Gulf level. Accordingly, the numerous hydrologic charts received in evidence herein reflect depths which are four feet less than actually existed on the morning of February 1, 1973.

After placing his tow against the bank, Captain Scott made radio contact with the vessel CHRISTRIP, a launch used to take river pilots employed with an organization known as Associated Branch Pilots, or bar pilots, to and from their vessels. Scott advised CHRISTRIP of his position and indicated that passing vessels should be so alerted.

Captain Scott and able-bodied seaman Vernie Cossette stood a six hour watch ending at midnight E.S.T. Both testified that during this period they checked to be sure that the tow was maintaining its position up against the bank. They indicated that this was accomplished by assuring that the dike remained within the ¼ nautical mile range of the radar. Two wooden stakes

---

**2.** There is some conflict between the testimony of Captain Scott and that of pilot Daniel Meyers with regard to the place and the content of their conversation. Captain Scott indicated that the conversation probably took place between Pilottown and the Head of Passes. Meyers recalled that it took place as the vessels passed further downstream in the vicinity of Beacon # 26. Scott testified that Meyers told him where to hold up. Meyers stated that he merely indicated to Scott that, of the two alternatives suggested by Scott, one was preferable to the other. However, the Court need not resolve these conflicts as the material issue is clear—the flotilla did hold up on the west bank in the vicinity of Beacon # 26.

**3.** The time that the flotilla stopped on the west bank is recorded in the SOCRATES' log. (Exhibit ATC # 5.) All log entries were recorded in Eastern Standard Time to avoid confusion when making reports to the tug's home port in Norfolk, Virginia, located in the eastern time zone.

which they perceived to lie either on or near the bank off the port bow were observed to determine whether or not their position remained constant in relation to the bow of the barge. Both Cossette and Scott testified that the position of the stakes did remain constant during their watch as did the tug's 395° gyro heading. They stated that they observed Beacon 26 abeam and across the river during this period. No bearings were taken on any of these objects, their positions being assessed by "eyeballing" them.[4] No determination was ever made with respect to which transverse portion of the dike was upriver from the bow of the barge at a distance of ¼ nautical mile.

From midnight until 0600 E.S.T. February 1, the watch was maintained in a similar fashion according to the relief captain/mate Gus Blake and AB Wilbert Goodwin. They testified that the beacon remained abeam, the dike one quarter mile ahead, the two stakes off the port bow of the barge, and the heading of the vessel at 359°. By 0600 E.S.T. (0500 C.S.T.) visibility was worsening because of fog which would periodically come and go.

Scott and Cossette returned to the watch at 0600 or shortly before. They testified that the position of the flotilla vis a vis the check points appeared to be as it had been the night before when they went off watch. The patchy fog conditions present when the two went on watch worsened until, for as much as one-half hour before the collision (according to Scott), visibility was restricted to approximately 100 feet. During this period Scott testified that he could see only the stern portion—approximately 80 feet forward of the stern—of the barge ahead, but from the list which he detected in its stern he perceived that it was still aground.[5] Approximately 45 minutes prior to collision Cossette noted Beacon 26 to be somewhere between his starboard quarter and the stern of the tug. According to the watch personnel, the stakes, the beacon,

and the dike were obliterated by the fog for as much as one-half hour prior to collision, which occurred at 0740 C.S.T.

No fog signals were sounded by the SOCRATES, either by whistle or bell, from the time that the fog set in until collision. During the watch prior to collision the windows of the pilothouse were closed and both Scott and Cossette remained inside. Neither Scott nor Cossette made any radio calls. Both testified that the radar was checked periodically to determine whether the flotilla was still in position ¼ nautical mile below the dike and to check for traffic passing in the area.

At 0540 hours C.S.T. on February 1, the HESS REFINER completed loading crude oil at Ostrica, Louisiana, and commenced a downbound passage in the Mississippi toward the Gulf. The vessel was fully manned and equipped with VHF radio and radar. At the conn was James Moore, a licensed pilot and member of the Associated Federal Coast Pilots of Louisiana. From the time of departure from Ostrica up to and including collision, all equipment was functional with the exception of the vessel's course recorder which, for unknown reasons, ceased to function some 15 minutes after departure, but which in no way contributed to the happening of the accident at issue herein.

According to the bridge bell book,[6] the HESS REFINER encountered light fog at 0640 C.S.T., as the vessel passed Venice, Louisiana. At 0714, in the vicinity of the "Texaco dock," low fog was noted. At 0717 conditions were recorded by second mate Julian Allen as "dense low fog."

On the bridge, along with the pilot and mate Allen, were the ship's master, John Rose, and the helmsman, Graham Wright. James Scott, lookout, was posted on the bow.

Despite the 0717 bell book entry reflecting dense low fog, the vessel proceeded

4. Transcript, Vol. 3, p. 116.

5. Transcript, Vol. 3, pp. 119–121.

6. Hess Exhibit # 2.

beyond Pilottown and its anchorage area,[7] through the Head of Passes, and into Southwest Pass at 0726 bell book time. According to the testimony of the pilot, fog conditions were not evident until the vessel actually entered the pass, and other vessels were not anchoring in the Pilottown anchorage as his vessel passed.[8] There is no evidence that the pilot attempted to contact any traffic in the pass at this time to attempt to ascertain weather conditions in the pass prior to proceeding downstream from Pilottown despite the fact that he noted "haze" ahead.[9] The master did not question the pilot's decision to proceed.

Moore testified that, as the vessel entered the pass, fog obscured both banks. His vessel's engines were at half ahead, giving the ship a speed—in light of river current—of approximately 12–14 m.p.h. over the ground. This speed was, according to pilot Moore, the minimum required to maintain steerageway to navigate the fully loaded vessel through the pass.[10]

The pilot was equipped with a walkie-talkie which was tuned to Channel 13, as was the ship's more powerful radio. Moore testified that, although he made several calls on both these units to ascertain traffic conditions in the pass ahead, no responses were received.[11]

Moore indicated that he was using the ship's radar on a two mile range to look ahead for traffic, switching to a one mile range for navigation. He was observing the radar screen himself, checking it periodically as he looked ahead visually and attended to his navigational duties. None of the bridge personnel were assigned to monitor the radar screen constantly. No radar

plots were made by anyone on the bridge during the morning.

A little below the entrance to the pass, Moore noted a "congested area" somewhat less than two miles ahead on his radar.[12] There were three targets, according to Moore, who assumed that certain of them were vessels which had preceded him downriver. He testified that, at this time, he again called for traffic, received no response, and continued at half ahead.

The HESS REFINER came down off the ranges on the east side of the river on a course of about 200 degrees. Thereafter, she angled to the west side on a course of 207°.[13] The pilot continued to observe the radar and the "blip" which later proved to be the SOCRATES. He believed it to be a small vessel which he could pass to port, despite his impression that it was perpendicular to this bow.[14] The HESS REFINER's engines remained at half ahead. Visibility remained extremely limited. Fog signals were regularly sounded on the ship's whistle.

Meanwhile, in the wheelhouse of the SOCRATES, Cossette noted a blip on his radar which was the HESS REFINER approximately ½–¾ nautical miles upriver. He testified that he brought it to the attention of Captain Scott who checked the radar screen and, not feeling any concern because of the blip, then returned to sit on the couch where he had been sitting previously. Scott testified that he felt that he was out of the channel and that other vessels knew where he was. He felt that the position of the vessel on the radar was comparable to that of other traffic which had passed with-

7. 33 C.F.R. § 110.195(a)(1) provides for a "Pilottown Anchorage" consisting of "An area approximately 5.2 miles in length along the right descending bank or west side of the river.... This anchorage is for ships which cannot proceed to sea because of fog at the Gulf ends of South and Southwest Passes or for any other reason."

8. Transcript, Vol. 1, pp. 88–90, 137, 148–149.

9. Transcript, Vol. 1, p. 89.

10. Transcript, Vol. 1, pp. 90–92.

11. Transcript, Vol. 1, pp. 95–96, 101.
   Transcript of Coast Guard Testimony, Vol. 1, pp. 32–33 (Allen).
   Transcript of Coast Guard Testimony, Vol. 4, pp. 8–9 (Rose).

12. Transcript, Vol. 1, pp. 92–94.

13. Transcript, Vol. 1, p. 98.
   Transcript of Coast Guard Testimony, Vol. 1, pp. 71–72 (Wright).

14. Transcript, Vol. 1, pp. 96–101.

out event during the time that the flotilla had been holding to the bank.[15]

Suddenly the bridge personnel on the HESS REFINER saw the superstructure of the SOCRATES appear out of the fog just off the port bow and not more than ¾ mile ahead.[16] Almost simultaneously it was realized that, down in the dense fog close to the water, lay a barge which was directly in the path of the vessel.

Moments before impact Scott and Cossette saw the bow of the HESS REFINER looming at them out of the fog. No evasive action was taken by the tug. Indeed at that point any attempt at evasive action would have been utterly fruitless.

On sighting the tug, Moore ordered full astern on the ship's engines and hard right rudder. When he perceived the barge in his path he ordered the rudder hard left in an attempt to strike the barge with the ship's bow in order to utilize the vessel's collision bulkheads and thereby minimize the danger of fire. After checking the swing of the bow to the right, the rudder was put amidships. The HESS REFINER blew a danger signal and seconds later her bow struck the starboard quarter of the AC-44. The blow parted the cables between tug and tow and both began to drift downstream.

Following impact, which occurred at approximately 0740 C.S.T., the engines of the HESS REFINER remained full astern until 0743 when they were stopped.[17] The vessel, with a combination of its remaining forward motion and the current, continued downstream angling toward the west bank, her bow pointing out into the river and her stern toward the bank.

According to the bridge bell book, the engines were full astern at 0744 and slow astern as of 0746.[18] The engine room bell book reflects that the engines were stopped from 0743 until they were put full astern at 0746.[19] At 0746 bridge bell book time, there was notification to the bridge that the engine room had been holed. At 0747 the engines were put slow ahead according to the engine room bell book.[20] At 0751 the vessel went aground and the engines were stopped.

According to the personnel in the engine room, several minutes elapsed from the time they discovered the damage to the hull until they notified the bridge.[21]

The Court has long and carefully considered how this accident occurred and concludes that both the HESS REFINER and the SOCRATES caused the accident through their actions or inaction, and each had the opportunity to act so as to avoid it. Each proceeded, in weather conditions which dictated utmost caution and prudence, with courses of action born of their own inattention to or misapprehension of the situation as it was.

The HESS REFINER proceeded downriver at excessive speed in dense fog toward an unplotted radar target across its bow which did not answer its radio calls. The SOCRATES, making no headway and completely fogged in adjacent to a narrow and much traveled waterway, simply ignored its situation and that of passing traffic and neglected to adequately assure either that its position was maintained in a manner so as not to obstruct the navigable channel which other traffic might use or to keep others advised of its position whatever it may be.

Clearly pilot Moore was convinced he could pass the object ahead of him without

**15.** Transcript, Vol. 3, pp. 54–57.

**16.** Transcript, Vol. 1, pp. 97, 103; Vol. 2, pp. 143, 147.
Transcript of Coast Guard Testimony, Vol. 1, pp. 13–14, 24, 37–40 (Allen); pp. 72, 90–92 (Wright); Vol. 4, pp. 9, 15–16, 25, 40–41, 57–59, 67–68 (Rose).

**17.** Hess Exhibits # 2 and # 4.

**18.** Hess Exhibit # 2.

**19.** Hess Exhibit # 4.

**20.** First Engineer Andalay Juneau testified that the 0747 should read slow astern. (Deposition of Juneau at p. 12).

**21.** Thornell Deposition at p. 69.
See also Transcript of Coast Guard Testimony, Vol. 1, pp. 56–57 (Allen); p. 123 (Wright).

incident. Captain Scott apparently honestly believed that he was out of the way of passing traffic. Both were wrong and both vessels must share the blame for the result.

## STATUS OF THE VESSELS

At the outset, and in order to ascertain the proper navigational rules to be applied herein, the status of the vessels must be determined. Obviously the HESS REFINER was a vessel underway. The status of the SOCRATES is not so clear.

SOCRATES herself has taken various positions in this litigation as to her status while holding up against the bank.[22] It is claimed that the SOCRATES is entitled to the presumption of fault arising when a moving vessel strikes one anchored or moored. However, it is also urged that the tug did not violate either 33 U.S.C. § 409[23] or 33 C.F.R. § 110.195(b)(1)[24] because she was not anchored. SOCRATES further claims that fog signals were not necessary because the vessel was aground; that there was no need to post a lookout because the vessel was stationary; and that there was no need to maintain a listening watch on the radio because the vessel was not navigating.

The Inland Rules are applicable to this collision which occurred on the Mississippi River below the Huey P. Long Bridge. 33 U.S.C. § 154. Accordingly, a vessel is to be considered underway, "... when she is not at anchor, or made fast to the shore, or aground." 33 U.S.C. § 155.

The SOCRATES was not aground. While the bow of the AC–44 may have been, this condition was maintained only by the use of the tug's engines pushing against the bank and the current in order to keep the barge from slipping off. The engines were never shut down from the time that the tow rounded up until the time of the collision. No anchors were set out. No lines moored the barge or the tug to the shore or to any other object.

We therefore hold that the SOCRATES was a vessel underway for navigational purposes at all times pertinent hereto. *The Ruth*, 186 F. 87 (9 Cir. 1911); *see also* Griffin, *The American Law of Collision* (1949) at § 15.

## POSITIONS OF THE VESSELS

Each of the parties to the collision charges that the other was in an improper position in the river at the time of the accident. Hess urges that the SOCRATES and tow, in the absence of any emergency situation, stopped on the west bank of the pass in a manner which obstructed the navigation of the HESS REFINER in violation of 33 U.S.C. § 409 and 33 C.F.R. § 110.-195(b)(1). Allied Towing charges that the HESS REFINER, as the result of a misunderstanding by the helmsman of the pilot's rudder order, was steering a course of 227°, rather than 207°, and heading into the bank toward the flotilla behind the dike and out of the channel. We cannot accept either proposition as urged.

The evidence simply does not support the theory that the HESS REFINER was steering a course of 227° and sheering into the bank. Although the helmsman, in testimony before the Coast Guard shortly after the casualty, initially indicated that he was steering a course ending in "7", e.g., 207° or

---

22. *See* Reply Brief of Allied Towing Company, owner of SOCRATES.

23. 33 U.S.C. § 409 provides in pertinent part "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft...."

24. 33 C.F.R. § 110.195(b)(1) provides "Except in cases of poor visibility or other emergency, anchoring is prohibited in the Mississippi River below Baton Rouge outside of the established anchorages or in South and Southwest Passes. If it becomes necessary in an emergency to anchor a vessel outside of the prescribed anchorages the vessel shall be so anchored that it will not interfere with or endanger other vessels, and it shall be moved as soon as the emergency is over. If it becomes necessary in an emergency to anchor a vessel in South Pass or Southwest Pass, the vessel shall take a position as close to the east bank as possible."

227°;[25] this is the only evidence suggestive of that point. It is not supported either by the testimony of helmsman Wright taken as a whole nor by the totality of the evidence received at trial.

The evidence reveals that the HESS REFINER was steering a course of 205°–207°, which was proper and usual for this stretch of the river.[26] The vessel was proceeding to the right or west of the midline of the channel in an area in which downbound vessels customarily stay to the right to allow port to port passing with upbound vessels.[27]

█ Allied Towing suggests that the HESS REFINER was too far to the right of the fairway and improperly outside of the dredged 40 foot channel. Allied Towing urges that this position is supported by the decision of this Court in *Warrior and Gulf Navigation v. S.S. Steel Voyager*, 237 F.Supp. 200 (E.D.La.1964). We cannot agree. The accident therein, although occurring in fog like the one at bar, took place near a known and much frequented anchorage area. The defendant vessel in that case was held to have ventured too close to the bank on which the anchorage was located. In the instant case, the HESS REFINER was transiting a narrow pass in which anchored vessels are by regulation limited to the east side of the channel in special circumstances. While tugs with tows apparently frequently hold up along the bank in positions similar to that allegedly taken by the SOCRATES, they position themselves completely behind the dikes located along the west bank according to pilots who regularly transit the pass.[28] The dredged channel is not marked by buoys. There is no requirement that a vessel stay within it. A vessel is legally entitled to navigate in those parts of a stream having sufficient depth to permit navigation. *Reading Company v. Pope & Talbot, Inc.*, 192 F.Supp. 663 (E.D. Pa.1961), *aff'd*, 295 F.2d 40 (3 Cir. 1961). The pilots who regularly navigate Southwest Pass adhere to such practice.[29]

As the HESS REFINER proceeded toward collision, she was on the proper side of the midline of the channel to meet any upbound traffic which she might encounter. She was not too far to the right of the channel. She did not strike dike 3.05 nor did she threaten to so do. She was at all times floating until she went aground after the collision at which time she was drifting out of control as the result of the impact.[30]

With respect to the position of the SOCRATES, a vessel underway, we find that 33 U.S.C. § 409 and 33 CFR § 110.195(b)(1) are not applicable as they apply by their own terms to anchored vessels. However, the fact that the SOCRATES was not in violation of such statutes does not, in light of the circumstances herein, relieve her of fault arising from her position at the time of the accident.

The evidence herein renders it impossible to plot either the initial position of the flotilla against the bank or its exact position at the time of collision. The evidence suggests that in clear weather during the evening and early morning preceding the collision, the tug and tow created no obstruction to passing vessels. However, it also preponderates in favor of the conclusion that, at some point and in some manner, the entire flotilla or part of it moved so as to extend at least the stern of the barge and the tug beyond the end of dike 3.05, whereupon it became an obstacle in the path of the HESS REFINER.

**25.** Transcript of Coast Guard Testimony, Vol. 1, p. 71.

**26.** Transcript, Vol. 1, pp. 98–99.
Transcript of Coast Guard Testimony, Vol. 1, p. 77, 87–88 (Wright); Vol. 4, p. 13 (Rose).
[*See* generally trial testimony of bar pilots.]

**27.** Transcript, Vol. 2, p. 167; Vol. 3, p. 101; Vol. 5, pp. 195–196, 237; Vol. 6, p. 158, Vol. 7, p. 121.

**28.** Transcript, Vol. 5, pp. 209, 225; Vol. 7, pp. 81, 91, 134, 152, 159.

**29.** Transcript, Vol. 3, p. 153; Vol. 5, p. 247; Vol. 6, p. 155; Vol. 7, pp. 113–114.

**30.** Transcript, Vol. 1, pp. 110–112; Vol. 2, pp. 154–157.

While none of the pilots who passed the flotilla during the night and the early morning preceding the collision testified that the flotilla obstructed their navigation, their observations with respect to its position varied considerably.[31] At approximately 4:00 a.m. February 1, pilot Charles Booksh noted the stern of the tug to be even with or slightly inside the line of the dikes along the west bank. Pilot Albro Michell passed the flotilla at approximately 5:30 a.m. and perceived the tug to be slightly out from the dike toward the channel in a position not appreciably different from that in which it had been as he passed on an earlier transit the night before. Pilot Daniel Meyers, who passed at approximately 6:00 a.m., testified that the flotilla was behind the dike, the stern of the tug being about even with it.

Pilot Louis E. Miller passed the flotilla only about 15 minutes prior to the collision between it and the HESS REFINER. Presumably his testimony as to the position of tug and tow at that time would be a good indication of its relative position at the time of impact. However, we are unable to give any credence to pilot Miller's testimony. According to Miller, when he passed the flotilla at approximately 7:25 or 7:30 a.m. the weather was clear, he got a very good look at the flotilla, and he perceived a decided starboard list in the barge which told him that it was aground.[32] In light of the evidence herein, we simply cannot accept pilot Miller's version of visibility conditions shortly before the accident. Both Captain Scott and Vernie Cossette testified that visibility was extremely limited for 30–45 minutes prior to collision. The bridge bell book of the HESS REFINER notes dense fog from 0717 hours and that vessel was sounding fog signals as she proceeded. Robert L. Owen, a wireline operator who was working in a canal adjacent to the west bank of the river at the time of the collision, testified

that there was a dense bank of fog some four to five feet in height hanging over the river that morning.[33] Under the circumstances we cannot accept as credible the assertion by pilot Miller that he was able to see the barge clearly and to determine that it was listing and aground.

The fact that at least the stern of the SOCRATES changed position from the watch of Gus Blake from midnight to 0600 E.S.T. to that of Scott and Cossette from 0600 to collision is evident from the testimony of Blake and Cossette. Blake testified that he was able to see Beacon 26 across the river straight out the side window of the wheelhouse and almost directly abeam.[34] The next morning, according to Cossette, the beacon was visible through the back window if he leaned forward in his seat at the wheel.[35]

■ Had the flotilla been positioned as Allied Towing urges that it was at collision—at a heading of 359° and inside the dike—the accident could not have occurred unless the HESS REFINER angled into the bank at a rather acute angle. Following collision on such a course the HESS REFINER, considering its weight, size and speed, would have plowed on and into the bank and no maneuver or attempted maneuver could have prevented it. However, the evidence clearly establishes that she did not go into the bank after impact, but remained afloat and continued downriver out of control and ultimately went aground. As the facts belie the probability that the HESS REFINER was off course and heading into the bank prior to collision, the only conclusion which remains, in light of the fact that the accident did in fact occur, is that the SOCRATES and tow obstructed navigation. The rather obvious conclusion is that, sometime after the fog set in, obscuring the objects upon which the tug's crew had been gauging their position, and

31. Transcript, Vol. 5, pp. 211, 234, 239; Vol. 6, p. 146; Vol. 7, pp. 80, 92, 159.

32. Transcript, Vol. 7, pp. 76–78, 95.

33. Transcript, Vol. 1, pp. 47, 57, 59, 60.

34. Deposition of August Blake at p. 14.
   *See also* Deposition of Wilbert Goodwin at p. 33.

35. Transcript, Vol. 8, pp. 85–93.

unknown to them, the flotilla drifted or pivoted, moving beyond the end of the dike and extending into that portion of the waterway in which the HESS REFINER could and did navigate. We hold that the movement of the flotilla from a position of safety to one of peril occurred through the negligence of the crew who failed to carefully initially determine their position and who failed to maintain a vigilant watch for the purpose of insuring that it remained stable.

## FAULTS IN THE FOG

■ *Fog Signals*: There is no dispute that, at the time of the collision, and for some time prior thereto, there was fog in Southwest Pass. A vessel underway towing is required to sound whistle signals in fog. 33 U.S.C. § 191, subd. 2(e).[36] Thus the failure of the SOCRATES to sound any whistle signals was a statutory fault. SOCRATES urges that sounding such signals would have served only to mislead the oncoming HESS REFINER as the tug and tow were not in motion.[37] However, had the tug properly sounded signals, the moving HESS REFINER would have, upon hearing them, had the duty to stop to ascertain the sounding vessel's position. 33 U.S.C. § 192; *see Hess Shipping Corporation v. SS Charles Lykes*, 417 F.2d 346 (5 Cir. 1969), *cert. denied*, 400 U.S. 853, 91 S.Ct. 56, 27 L.Ed.2d 191 (1970); *Getty Oil (Eastern Operations) v. SS Ponce de Leon*,

409 F.Supp. 909 (S.D.N.Y.1976), *aff'd*, 555 F.2d 328 (2 Cir. 1977). It cannot be doubted that proper sound signals would have alerted the vessel's bridge personnel to the presence of a tug and tow. It is clear that, as he approached, the pilot on the HESS REFINER perceived the blip on his radar to be only one vessel which he apparently believed he could pass without difficulty. Had the SOCRATES sounded the prescribed signal for a vessel towing, it would have advised the HESS REFINER of her misapprehension with respect to the probable size of the obstacle in her path. We do not doubt that signals from the tug would have been heard by the ship which had a bow lookout posted at all times. As the sound signals could have been heard by the lookout before the flotilla could have been observed visually, there would have existed a greater period of time within which the HESS REFINER could have maneuvered to avoid the accident, either by changing course, slowing, or even possibly coming to a stop prior to impact. Clearly the failure of the SOCRATES to sound fog signals of any sort contributed in part to the happening of the collision.

*Speed*: The HESS REFINER was also guilty of statutory fault in light of existing conditions. A vessel proceeding in fog is required to "... go at a moderate speed, having careful regard to the existing circumstances and conditions." 33 U.S.C.

---

**36.** Even should the SOCRATES be deemed an anchored vessel, fog signals were required under the circumstances. 33 U.S.C. § 191, subd. 2(d).

**37.** By letter of February 26, 1979, counsel for Allied Towing urges the applicability of *Valley Towing Company v. SS American Wheat, et al.*, 1978 A.M.C. 2175 (E.D.La.1977) to the case at bar arguing that it stands for the proposition that a tug holding barges up against the river bank in fog is not required to sound fog signals. However, careful review of that decision reveals that it is clearly distinguishable from the instant case. The *American Wheat* involved a collision between two vessels other than the tow holding against the bank, although incident thereto some of the barges making up the tow were damaged. While the Court found that the towing vessel ROY P. SCHOUEST was not sounding fog signals, it further found that the

position of the SCHOUEST and tow did not in any way confuse or affect the navigation or maneuvering of the colliding vessels. Under the circumstances of that case it was found that the failure to sound fog signals was excused in light of the General Prudential Rule. 33 U.S.C. § 212. In the instant case the SOCRATES was in a position which could and did affect the navigation of the HESS REFINER. While any fog signals sounded by the ROY P. SCHOUEST may have confused the navigation of the colliding vessels in the *American Wheat* case, it is clear that the sounding of the required fog signals by the SOCRATES could only have served to clarify its status and position. In the instant case the danger of collision was increased by the failure to sound fog signals on the part of the SOCRATES. The General Prudential Rule is not applicable in this case to excuse such failure.

§ 192. "Moderate speed," while a relative term to be determined in light of the specific facts of each individual case, is often measured utilizing the "half distance rule" or "rule of sight" which requires that a vessel in fog shall proceed at a speed no greater than would allow her to come to a stop within one-half the limit of her visibility. *Union Oil Company of California v. The San Jacinto*, 409 U.S. 140, 92 S.Ct. 368, 34 L.Ed.2d 365 (1972); *O/Y Finlayson-Forssa A/B v. Pan Atlantic Steamship Corp.*, 259 F.2d 11 (5 Cir. 1958); *Hess Shipping Corporation v. SS Charles Lykes*, supra; *Polarus Steamship Co. v. The T/S Sandefjord*, 236 F.2d 270 (2 Cir. 1956); Griffin, *The American Law of Collision*, § 117. Moderate speed in fog is also gauged by reference to the "bare steerage rule" which holds that a vessel in fog should reduce its speed to the lowest point which will allow steerageway. *Hess Shipping v. SS Charles Lykes*, supra; *Skibs A/S Siljestad v. SS Mathew Luckenbach*, 215 F.Supp. 667 (S.D.N.Y. 1963).

However, despite which standard is applied in this case, it is clear that, in light of the circumstances and conditions existing at the time of the casualty, the speed of the HESS REFINER was excessive and imprudent and in violation of 33 U.S.C. § 192. Upon entering the pass, more than three miles above the point of collision, the pilot was unable to see the banks.[38] Despite his testimony, and that of Captain Rose, to the effect that weather conditions were improving so as to allow them to see a mile down the east bank from their position on the bridge of the HESS REFINER,[39] it is obvious from testimony of the persons aboard the SOCRATES that fog was still extremely dense over the surface of the water where the tow was located. The conclusion that there was dense low fog over the water is supported by the fact that the AC–44 was not visually sighted by the HESS REFINER bridge personnel until almost the point of collision.

Until moments before impact the vessel was proceeding at half ahead at a speed estimated by the pilot to be 12–14 m.p.h. over the ground.[40] According to Moore, at a speed of 12 m.p.h., with river conditions as they were the date of collision, he would need ". . . at least a mile and three quarters to top her around."[41] He was unable to stop in half the distance of his visibility when he sighted the SOCRATES.[42] Moore took the position that he was required to proceed at half ahead in order to maintain steerage of his loaded vessel, but conceded that he could have gone to dead slow ahead at light 27, upriver from the point of collision.[43] However, assuming that the half ahead speed was required to maintain steerageway, in light of weather conditions, such speed was excessive and the vessel should have anchored rather than proceed. *Barrios Brothers v. Lake Tankers Corporation*, 188 F.Supp. 300, 303 (E.D.La.1960), aff'd, 286 F.2d 573 (5 Cir. 1961); *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

■ We therefore conclude that the HESS REFINER was operating at an excessive speed in fog and that her speed was a contributing cause of the casualty.

■ *Lookout*: Both vessels were required by 33 U.S.C. § 221 to keep a proper lookout. Both breached this duty as is hereinafter set out.

Both the HESS REFINER and the SOCRATES were equipped with operational radar, which was being observed periodically. However, in light of weather conditions, the radar watch on both vessels was neither proper nor sufficient and contributed to the happening of the accident.

Although there were sufficient personnel on the bridge of the HESS REFINER (in

---

**38.** Transcript, Vol. 1, pp. 88–90.

**39.** Transcript, Vol. 1, p. 96.
Transcript of Coast Guard Testimony, Vol. 4, pp. 10, 68

**40.** Transcript, Vol. 1, p. 91.

**41.** Transcript, Vol. 2, p. 147.

**42.** Transcript, Vol. 2, p. 148.

**43.** Transcript, Vol. 1, p. 169.

addition to the pilot and helmsman both the master and the first mate were present and obviously able), no one was assigned to monitor the radar and the pilot did so as he visually navigated. Under the circumstances we find that someone should have been assigned exclusively to the radarscope. *Barrios Brothers v. Lake Tankers*, supra; *Avondale Marine Ways Inc. v. The Crescent Cities*, 184 F.Supp. 773 (E.D.La.1975). Although Captain Scott was looking at his tug's radar screen from time to time, he was making no attempt to analyze the data provided which in effect negated the fact that he was watching at all. *Skibs v. A/S Siljestad v. SS Mathew Luckenbach*, supra, at 680–681. Although each vessel saw the other on its radar screen prior to collision, neither made any plot of the other's position as each should have under the circumstances. *Afran Transport Co. v. The Bergechief*, 274 F.2d 469 (2 Cir. 1960); *Polarus Steamship Co. v. The T/S Sandefjord*, supra; *Getty Oil (Eastern Operations) v. SS Ponce de Leon*, supra. We find that both vessels violated 33 U.S.C. § 221 by their failure to adequately monitor and/or interpret their respective radar devices.

The evidence reveals that the SOCRATES had no lookout posted at any place on either tug or tow. Both members of the watch were stationed inside the pilothouse with the windows closed at and shortly before collision. No evidence received herein suggests that the HESS REFINER was not sounding regular fog signals as she approached the SOCRATES. However, neither Scott nor Cossette indicated that they heard them.[44] As noted earlier, the HESS REFINER maintained a lookout on its bow.

■ The duties of a tug with tow include the duty to keep a proper lookout. *Cenac Towing Co. v. Keystone Shipping Co.*, 404 F.2d 698 (5 Cir. 1968). While it is doubtful that any lookout posted by the SOCRATES could have seen the approaching vessel, presumably one would have been able to hear the HESS REFINER's fog signals warning of her approach. *Zeller Marine Equipment Inc. v. SS Chemical Transporter*, 307 F.Supp. 138 (S.D.N.Y.1969), *aff'd*, 423 F.2d 1224 (2 Cir. 1969); *Schwabe v. The M/V Birney R*, 198 F.Supp. 515 (E.D.La.1961).

In light of all the evidence with respect to the attitude of the SOCRATES crew toward passing traffic, we question whether or not any danger would have been perceived had the fog signals been heard. However, we cannot conclude, based upon all the evidence, that the failure to have a lookout posted so as to be capable of hearing signals of passing traffic could not have contributed to the collision herein. *The Pennsylvania*, supra.

■ *Radio* : Also contributing to the collision was the failure of the SOCRATES to maintain a proper watch in conformity with the Vessel Bridge-to-Bridge Radiotelephone Act, 33 U.S.C. § 1201 *et seq.* SOCRATES argues that it was not responsible for keeping the "listening" watch required by 33 U.S.C. § 1204[45] for the reason that it was not a towing vessel "navigating" within the meaning of 33 U.S.C. § 1203(a)(3).[46] However, we have found that the SOCRATES was a vessel underway. Although we have no statutory or jurisprudential guidance as to the meaning of the term "navigating" as used in § 1203(a)(3), we feel that the conditions attendant to the SOCRATES holding to the bank on the date of the accident satisfied that condition. The SOCRATES was at all times maintaining her position by means of her engines and was unattached to land by means of lines or anchors. Although she was not maneuvering as she held her tow against the bank, it is clear that she was ready and able to do so in the

44. Transcript, Vol. 3, pp. 58–59; Vol. 8, p. 52.

45. 33 U.S.C. § 1204 provides "The radiotelephone required by this chapter [33 U.S.C. § 1201 *et seq.*] is for the exclusive use of the master or person in charge of the vessel, or the person designated by the master or person in charge to pilot or direct the movement of the vessel, who shall maintain a listening watch on the designated frequency...."

46. 33 U.S.C. § 1203(a)(3) requires radiotelephone equipment on "every towing vessel of twenty-six feet or over in length while navigating...."

event that it was determined that her tow was out of position.

The evidence reveals that pilot Moore on board the HESS REFINER made several radio attempts to ascertain the presence of traffic in the pass as he proceeded. There was no response from the SOCRATES whose watch personnel did not hear the calls.[47]

· In addition to the failure to maintain a listening watch, the SOCRATES failed in the affirmative duty to transmit information relative to its position which was necessary for safe navigation, thereby violating 33 C.F.R. § 26.04(b). After the initial call to the CHRISTRIP, the SOCRATES advised no one of her position despite the fact that weather conditions and visibility deteriorated as the flotilla held against the bank. (*See also, Getty Oil (Eastern Operations) v. SS Ponce de Leon*, supra, at pp. 918–19, holding that vessel's failure to make security calls was a violation of 33 U.S.C. § 221.)

### COMPARATIVE FAULT

As both the SOCRATES and the HESS REFINER were responsible for causing the collision, fault should be apportioned in conformity with *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975).[48]

■ In light of all the evidence, and for the reasons set out hereinbefore, we find that both vessels created the danger of collision and both could have acted so as to avoid it. Accordingly, we conclude that the SOCRATES and the HESS REFINER were equally at fault in causing the subject collision and damages should be borne by those parties on such basis.

### DAMAGE CAUSED BY THE SUBMERGED OBJECT

As indicated previously, it is not only the impact between the HESS REFINER and the AC–44 which forms the basis of the damage claims herein. Rather, in addition to what we will refer to as the initial impact between ship and barge on the morning of February 1, 1973, the HESS REFINER, some minutes subsequent to the initial impact, also came into contact with a submerged metal object which pierced the skin of the HESS REFINER causing flooding of the engine room area and hull damage. Throughout this litigation the parties have approached the damage to the hull of the HESS REFINER as being the result of a casualty subsequent to that of the initial collision between the vessel and the AC–44. In conformity with that theory the Hess interests have sought recovery against the parties allegedly responsible for the presence of the submerged object. Those parties in turn have claimed against each other as is set out in the Appendix hereto. The facts giving rise to this facet of the matter are as follows.

In the early minutes of May 10, 1972, a collision occurred in Southwest Pass between the upbound oilfield supply vessel, T–TRUC # 1, and the downbound freighter GREAT FAITH.[49] The T–TRUC # 1, a steel hulled vessel 65 feet in length, 24 feet in width, and approximately 7 feet in depth,[50] was owned by Savare DeFelice d/b/a DeFelice Towing Company (DeFelice). The GREAT FAITH was owned by Great Fortune Navigation Ltd. (Great Fortune).

Upon impact the T–TRUC became lodged across the bow of the larger vessel and was carried downstream in this position for some distance from the point of collision until it freed itself, turned over, and presumably sank. Despite efforts by its owner DeFelice to do so, the wreck of the T–TRUC was never located and he took what

---

**47.** Transcript, Vol. 3, pp. 159–160; Vol. 8, p. 52.

**48.** Although *United States v. Reliable Transfer* was decided subsequent to the collision at issue herein, it is applicable to this case retroactively. *See Nutt v. Loomis Hydraulic Testing Co., Inc.*, 552 F.2d 1126 (5 Cir. 1977).

**49.** Transcript, Vol. 8, p. 138.

**50.** Transcript, Vol. 5, p. 145.

he believed to be appropriate steps to declare the vessel abandoned. Neither DeFelice, nor Great Fortune, nor the United States took any steps to make or remove the undiscovered wreck.

Within minutes of the time that her bow struck the AC–44, a piece of metal wreckage approximately 21 feet in length penetrated the starboard quarter of the HESS REFINER entering through the engine room with its forward end coming to rest in the starboard bunker tank just above the seventh longitudinal below the deck above, which was the first longitudinal above the floor plates.[51] The metal object created a hole in the HESS REFINER which extended from just aft of the cofferdam, at the after end of frame 46, to just aft of the fuel tank bulkhead at frame 36, a distance of approximately 30 feet, nine inches.[52]

It is the position of Hess that the metal object which pierced the HESS REFINER in the minutes following the initial impact was a portion of the rub rail of the sunken T–TRUC. Hess has therefore sought recovery from DeFelice, Great Fortune and the United States for the damage caused by the submerged object. Specifically Hess claims that DeFelice and Great Fortune, whose joint negligence allegedly caused the sinking, are liable by virtue of their violation of the Wreck Statute, 33 U.S.C. § 409, by failing to diligently locate, mark, and/or remove the wreck. Additionally, Hess charges that the United States is liable as the result of its failure to mark or remove the wreck in conformity with 33 U.S.C. § 414.

DeFelice takes the position that he made a diligent effort to locate his vessel and is not responsible for its whereabouts having abandoned it. Alternatively, in the event of his responsibility, he seeks to limit his liability. Great Fortune claims that, as it did not own the vessel, it has no responsibil-

ity for its marking or removal pursuant to 33 U.S.C. § 409. Both DeFelice and Great Fortune strongly deny that the object which struck the HESS REFINER was a portion of the T–TRUC or that such object was located in navigable waters. The United States denies that it had any statutory duty to search for, mark, or remove the negligently sunk T–TRUC.

Much of the lengthy trial of this matter was devoted to presentation of complex expert testimony designed to support the theories of the various parties with respect to the identity of the submerged object. However, for the reasons hereinafter set out, we find that there was no casualty separable from the initial collision for which the parties to it are responsible. Accordingly, resolution of the factual issues relating to the identity of the submerged object, as well as the legal issues attendant to the claims regarding wreck marking and removal, although both intellectually and legally challenging, is not material to our decision herein.

It is clear that the engine room of the HESS REFINER sustained damage within minutes of the contact between the HESS REFINER and the AC–44. The damage occurred as the vessel was drifting out of control as the result of the collision.[53] Due to the combined forces of the current, the remaining forward motion of the vessel, and the maneuvers attempted prior to collision, the vessel was flanking downstream with its stern toward the bank. She continued thus until she went aground minutes after being holed by the metal object.[54]

Undoubtedly the position of the HESS REFINER at the point of her contact with the metal object resulted directly from the occurrence of the collision, which caused the vessel to drift out of control and toward the west bank. Damage to the hull of a vessel as the result of contact with a

---

**51.** Exhibit Hess Nos. 54A–54L; Transcript, Vol. 11, pp. 21–22.

**52.** Transcript, Vol. 11, p. 33.

**53.** Transcript, Vol. 1, p. 112; Vol. 2, pp. 162–163.

Transcript of Coast Guard Testimony, Vol. 1, pp. 82–84. *See also* Footnote 30, supra.

**54.** Transcript of Coast Guard Testimony, Vol. 1, pp. 70–71, 123.
Hess Exhibits # 2 and # 4.

submerged object is foreseeable. *See Olympic Towing Corporation v. Nebel Towing Company*, 419 F.2d 230, 233–34 (5 Cir. 1969), *cert. den'd*, 397 U.S. 989, 90 S.Ct. 1120, 25 L.Ed.2d 396 (1970). In this case the HESS REFINER came into contact with a submerged object as the result of a collision occasioned by her own negligence and that of the SOCRATES. No intervening negligent act occurred to interrupt the chain of causation begun by the collision between the vessel and the AC–44. Even assuming that the submerged object's presence was due to the negligence of some other party or parties, the sole cause of the presence of the HESS REFINER in the place in which it sustained damage was the collision which caused the HESS REFINER to deviate from her precollision course.[55]

■ We hold that the damage to the starboard quarter of the HESS REFINER was a direct, proximate, and foreseeable result of the vessel-barge collision, which damage should be borne by the parties involved in proportion to their respective faults. *Olympic Towing Corporation v. Nebel Towing Company*, supra; *Kawasaki Zosensho v. Cosulich Societa Triestina de Navigazione*, 11 F.2d 836 (5 Cir. 1926); *The Sylvia*, 1924 AMC 1222 (E.D.N.Y.1924); *The John Bresnahan*, 58 F.2d 678 (S.D.N.Y. 1932), *aff'd*, 62 F.2d 1077 (2 Cir. 1933); *Oaksmith v. The Mayflower*, 94 F.Supp. 574 (D.Alaska 1951); *King Fisher Marine Service, Inc. v. Petroleos Mexicanos*, 428 F.2d 1052 (5 Cir. 1970); *United States v. Reliable Transfer Co., Inc.*, supra; *see also* Griffin, *The American Law of Collision*, supra at § 222.

Accordingly, for purposes of this litigation, the mystery of the identity of the submerged object must remain just that.

## LIMITATION OF LIABILITY

Hess has petitioned for exoneration from or limitation of liability pursuant to 46 U.S.C. § 183.[56]

As we have previously held, the collision resulted in part from the fault of the HESS REFINER. However, the evidence reveals that she was seaworthy in all respects, her fault resulting from the negligence of and the errors in navigation by her master and/or crew.[57]

■ Our finding of contributory fault bars Hess's claim for exoneration. *Tittle v. Aldacosta*, 544 F.2d 752, 756 (5 Cir. 1977). In order to prevail on its claim for limitation, Hess as owner bears the burden of proving a lack of privity and knowledge of the circumstances forming the basis of the vessel's fault. *Tittle v. Aldacosta, Id.* Our review of the record reveals it to be utterly devoid of evidence that the absent owners of the HESS REFINER were or should have been aware of the likelihood of this occurrence. Accordingly, the petition for exoneration is denied, but limitation will be allowed. *Tittle v. Aldacosta*, supra. *Farrell Lines v. Jones*, 530 F.2d 7 (5 Cir. 1976); *Olympic Towing Corp. v. Nebel Towing Co.*, supra; Gilmore and Black, Law of Admiralty (2nd Ed., 1975) at § 10–22.

## RECOVERY OF THE TOW

■ There is no evidence of any fault on the part of Allied Chemical, its barge AC–44 or the cargo. Although the SOCRATES and the HESS REFINER were both at fault in causing the casualty, Allied Chemical, as owner of the damaged AC–44 and its

---

**55.** We note that even assuming that the submerged object constituted some part of a submerged wreck—either that of the T–TRUC or another vessel—which had been marked, the accident in this case would not have been avoided as the HESS REFINER was out of control heading out of her navigable channel and unable to maneuver so as to avoid anything.

**56.** As noted previously, DeFelice also claimed the benefit of limitation in the event that liabili-

ty on his part was found. As it has not been, we need not address that claim.

**57.** While the vessel was under the conn of a pilot, her master was at all times on the bridge and cognizant of the situation. He did not question the actions of the pilot nor did he countermand any of his orders. (*See* Transcript of Coast Guard Testimony, Vol. 1, p. 60 [Wright]; Vol. 4, testimony of Capt. Rose generally; Trial Transcript, Vols. 1 and 2, testimony of pilot Moore generally.)

cargo, is entitled to recover the entire amount of its loss from the Hess interests. *The Atlas*, 93 U.S. 302, 23 L.Ed. 863 (1876); *Complaint of Flota Mercante Grancolombiana, S.A.*, 440 F.Supp. 704, 724 (S.D.N.Y. 1977). Hess thereafter is entitled to include such damages paid as part of its overall damages herein. *The Chattahoochee*, 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801 (1899); *Complaint of Flota Mercante Grancolombiana, S.A.*, supra at pp. 724–25; *The Oriental Hero*, 1976 AMC 1287, 1306 (S.D.N.Y.1976).

In light of the foregoing, the petition of Hess for limitation of liability in Civil Action 73–2020 should be allowed, with the alternative claim therein for exoneration being denied. The amount of the limitation fund will be determined at the time of the trial of the damage issues herein. The claim of Hess against Allied Towing and its insurers in Civil Action 74–304 is allowed subject to the equal apportionment of fault found herein, determination of the proper amount of damages also to be made in subsequent proceedings. The claims of Allied Chemical for damage to the AC–44 and cargo as against Hess and its underwriters in Civil Actions 73–343 and 74–186 are allowed, such damages to be ascertained along with the other outstanding damage issues. The claims of Hess against DeFelice, Great Fortune, and the United States in Civil Actions 74–1274 and 74–2186 are de-

nied thereby rendering all cross claims therein moot.

Counsel shall submit an interlocutory decree in accordance with the foregoing and approved as to form by all counsel.

### APPENDIX

CIVIL ACTION 73–343: Allied Chemical Corporation (Allied Chemical) as owner of the barge ALLIED CHEMICAL NO. 44 seeks recovery of damages allegedly sustained by the barge from defendants Hess Tankship Company (Hess), Amerada Hess Corporation (Amerada Hess) and the HESS REFINER.[1]

CIVIL ACTION 73–2020: Petition of Hess and Amerada Hess as owner and bareboat charterer/owner *pro hac vice* of the HESS REFINER for exoneration from or limitation of liability. Allied Chemical and Allied Towing Corporation (Allied Towing), owner of the SOCRATES, answered and filed claims. The United States filed answer.

CIVIL ACTION 74–186: Allied Chemical seeks damages allegedly sustained by the AC–44 from certain insurers of the HESS REFINER and the Hess interests.[2] The underwriters, by third party complaint, claim against Allied Towing.[3]

CIVIL ACTION 74–304: Hess and Amerada Hess seek damages allegedly sustained by the HESS REFINER from Allied Towing, the SOCRATES,[4] and their underwriters.[5]

1. A counterclaim by Hess and Amerada Hess against Allied Chemical was dismissed on motion for involuntary dismissal during the course of trial. *See* Transcript, Vol. 11, p. 172; Vol. 13, p. 238.

2. Answer was filed by defendants American Hull Syndicate, Merchants Mutual Insurance Company, New Hampshire Insurance Company, Highlands Insurance Company, Ysuda Fire and Marine Insurance Company Ltd., Travelers Indemnity Company, Continental Market through J. Henrijean & Cie S.P.R.L., Emmco Insurance Company, First State Insurance Company, Edinburgh Assurance Company, Ltd. as representative for and on behalf of those British Companies, and David Edwin Weekes, as representative, and for and on behalf of those Underwriters at Lloyd's London, referred to as British Market (participation 20%) in that confirmation of insurance of Marsh & McLennan, Inc., dated September 26, 1972.

Defendant London Steamship Owners Mutual Insurance Association, Ltd. did not answer and entry of default was made by the Clerk of Court on August 2, 1974. (Record Doc. # 12.) Following trial Allied Chemical filed a certificate of insurance into the record which indicates that London Steamship Owners Mutual did provide insurance to the HESS REFINER. (Record Doc. # 85.)

3. The answering underwriters' counterclaim against Allied Chemical was dismissed at trial on motion for involuntary dismissal. (*See* Footnote 1.)

4. Plaintiffs' claim against Allied Chemical in this lawsuit was dismissed on motion at trial. (*See* Footnote 1) thereby rendering moot the claims against St. Paul Fire and Marine Insurance Company, Highlands Insurance Company, American Home Assurance Company, Hartford Fire Insurance Company, Emmco Insurance

5. See note 5 on page 1350.

CIVIL ACTION 74–1274: Hess and Amerada Hess seek damages sustained by their vessel, as well as contribution or indemnity with respect to claims against them arising from the casualty from Savare DeFelice d/b/a DeFelice Towing Company (DeFelice),[6] owner of the M/V T–TRUC # 1 and Great Fortune Navigation Ltd. (Great Fortune), owner of the M/V GREAT FAITH,[7] claiming that defendants failed to mark, remove, or warn of the wreck of the T–TRUC. DeFelice claims over against Great Fortune and the United States for indemnity. Great Fortune cross claims against DeFelice for indemnity.[8]

CIVIL ACTION 74–2186: Hess and Amerada Hess claim against the United States for damages allegedly sustained by their vessel as the result of the failure of the United States to mark or remove the sunken wreck and/or to keep the channel clear. The United States claims over against DeFelice and Great Fortune. DeFelice and Great Fortune cross claim against each other and against the United States.

---

Company, Employers Mutual Liability Insurance Company of Wisconsin, Insurance Company of the State of Pennsylvania, First State Insurance Company, Aetna Insurance Company, and Travelers Insurance Company as insurers of Allied Chemical.

5. Glen Falls Insurance Company, Emmco Insurance Company, Philip Alan Froude, as representative of and for and on behalf of those underwriters at Lloyd's London severally subscribing to that policy number 2400694 of excess liability insurance and Orion 'T'/London and Overseas 'T', English and American M2, British Law No. 2 A/c, Sphere/Drake, Edinburgh, Bishopsgate 'F' and A/c, Threadneedle, Insurance Corporation of Ireland 'L' A/c, Continental Insurance Company, Ltd. and Insurance Company of North America severally subscribing to policy no. 2400694. By amended

complaint plaintiffs added defendant Standard Steamship Owners Protection and Indemnity Association (Bermuda) Limited, alleging that that company was an additional insurer of Allied Towing and SOCRATES. No answer was filed by Standard Steamship in these proceedings. No default has been entered.

6. A claim by plaintiffs against DeFelice Marine Contractors, Inc. was dismissed at trial for failure of plaintiffs' to state a claim against that defendant. Transcript, Vol. 13, pp. 126–129.

7. Claims against the M/V GREAT FAITH were dismissed at trial without opposition for lack of jurisdiction. Transcript, Vol. 1, p. 7.

8. This pleading was, apparently mistakenly, docketed as Document # 42 in C.A. 73–343.